GREASY SLOUGH OUTING CLUB, INC. *v.* AMICK.

5-506                                                    274 S. W. 2d 63

Opinion delivered December 6, 1954.

[Rehearing denied January 24, 1955.]

1. EASEMENTS—IMPLIED EASEMENTS.—If an existing servitude or quasi-easement can be made the basis for the implication of an easement on the severance of certain property, it is essential that such easement be, at the time of conveyance, necessary, and not merely convenient, to the beneficial enjoyment of the dominant portion of the property.

*Frierson, Walker & Snellgrove,* for appellant.

*H. M. Cooley, Frank Sloan* and *W. B. Howard,* for appellee.

MINOR W. MILLWEE, Justice. This action was brought by appellee, Ralph Amick, against Greasy Slough Outing Club, Inc., Lee Wilson & Co., John W. Meyer, Lowell Simpson, J. H. Crain and J. E. Crain to recover damages to appellee's rice crop allegedly sustained when the crop was flooded at harvest time in 1949. It was alleged

that the flood damage was caused by the joint action of the defendants in negligently closing a floodgate and culvert through a levee surrounding the lands of the Outing Club thereby obstructing the natural drainage of the area in question. Defendants answered with a general denial and a plea of the 3-year statute of limitations (Ark. Stats., § 37-206). A nonsuit was taken as to Lee Wilson & Co. Trial resulted in a verdict and judgment for $12,469.40 against the other defendants who are the appellants here.

In 1940 Lee Wilson & Co. owned a large acreage in the southwestern part of Craighead County through which Greasy Slough flowed in a southerly course. The lands were bounded on the west by Johnson Ditch which flows southeasterly. Big Creek lies east of the lands in question and joins Johnson Ditch at the southern tip of said lands. In 1942 an area of about 867 acres which lies above the confluence of Johnson Ditch and Big Creek in the shape of a triangle was enclosed by Lee Wilson & Co. by a levee to form a reservoir which was originally intended for both agricultural and duck hunting purposes. A 48-inch culvert was installed on the west levee connecting Johnson Ditch and the reservoir. The north levee or line of said reservoir is along the east-west line between Sections 20 on the North and 29 on the South, in Township 13 North, Range 2 East. Prior to construction of the levee Greasy Slough flowed in a southwesterly direction through the western part of the lands which subsequently formed the reservoir. After construction of the reservoir levee the flowage of the slough was for a time completely obstructed through Section 29 to the south but there was some diversion of waters by means of a ditch or borrow pit along the north side of the western portion of the levee running due west into Johnson Ditch. The effectiveness of this irregular excavation as an outlet was a sharply disputed issue of fact.

In November, 1945, J. H. Crain, as trustee for Lee Wilson & Co., conveyed the reservoir and its levees to Greasy Slough Outing Club which was incorporated in

the same month as a duck hunting club and for other recreational purposes. In August, 1947, Lee Wilson & Co. leased to appellee for the years 1948 and 1949 about 900 acres lying north of the reservoir which included a portion of Greasy Slough and lands lying on either side of the stream. A supplemental lease was executed in February, 1948, adding more than 1,000 additional acres. In December, 1947, the Outing Club installed a 48-inch culvert with a movable floodgate in its north levee at the point where Greasy Slough formerly entered the reservoir lands.

In 1949 appellee had a rice crop on the lands which were drained in September for the purpose of harvesting which was begun September 25, 1949. Quincy Jackson and others were then engaged in constructing a secondary levee inside the reservoir for the Outing Club. The purpose of this levee was to impound waters on the east portion of the reservoir for duck hunting purposes. During the 5-day period from October 2nd to October 6th, inclusive, a rain totalling 5.58 inches fell in the area resulting in the flooding of appellee's rice crops.

Appellee offered evidence tending to establish the following facts. J. H. Crain was trustee and general manager of Lee Wilson & Co. He was also an incorporator of Greasy Slough Outing Club and president of the Craighead Rice Milling Company. J. E. Crain was also an incorporator of the Outing Club and its president and managing officer in 1949. Lowell Simpson was a supervisory employee of the Rice Milling Company in 1949 and subsequently became a farm manager for Lee Wilson & Co. John W. Meyer was employed as an engineer by Lee Wilson & Co. and designed and supervised the construction of the reservoir in 1942. He also supervised the installation of the floodgate for the Outing Club in 1947. Although Lee Wilson & Co., the Outing Club and the Rice Milling Company were separate corporate entities, it was shown that the officers and employees of each frequently performed services and exercised authority for the other by common consent. J. H. Crain stated that he was actually "in charge" of all three cor-

porations at times and the employees of all three re-
garded him as "the boss." Simpson and Meyer would
also frequently perform services and run errands for
the Outing Club. Although Quincy Jackson testified
that he was employed by Lee Wilson & Co. in the con-
struction of the secondary levee in October, 1949, it was
shown that the work was done for and at the request of
the Outing Club under an arrangement whereby Lee Wil-
son & Co. made initial payments for the work and was
later reimbursed by the Club because proper bookkeep-
ing facilities were maintained by the Wilson Company
but not by the Club.

Appellee testified that in the summer of 1948 he,
J. H. Crain and appellee's son were inspecting a portion
of the leased lands which were being cleared for cultiva-
tion. Appellee at that time asked Mr. Crain how they
were going to drain these lands in the cultivation and
harvesting of the rice and Crain told him that he (ap-
pellee) would have full authority to let the water into
the duck pond at the north floodgate whenever it was
necessary for the proper cultivation of the rice crops.
He further testified that Crain then sent John W. Meyer
over with locks which were installed on the floodgate
together with keys thereto which were furnished to ap-
pellee and his two sons; that subsequently the locks were
destroyed but appellee and his sons would open the flood-
gate when necessary until the heavy rain in October,
1949. At that time the floodgate was closed and a new
lock placed thereon by parties acting for the club. Also
at that time Jackson was still engaged in construction
work inside the reservoir and the club was desirous of
keeping out the water which interfered with the con-
struction work. Clyde Myatt testified that he placed the
lock on the gate when he was assisting in clearing lands
for the secondary levee inside the reservoir. He was a
nominal employee of Lee Wilson & Co. but stated that he
generally took orders from Lowell Simpson, J. W. Meyer,
and a Mr. Metcalf. There was evidence that Jackson
and his employees closed the floodgates at different
times prior to the heavy rain in October to keep the water

from interfering with the construction of the secondary levee. Lowell Simpson acted as supervisor of some of the clearing of the lands for the levee in the reservoir of the Outing Club.

When appellee's son, Jerry Amick, saw Myatt apply a new padlock to the floodgate about October 1, 1949, he went to see Simpson at the office of the Rice Milling Company about opening the gate. After an inspection of the waters at the site of the floodgate the next day, Simpson, who possessed keys to the gate, agreed to see about opening it. J. E. Crain was in active charge of the club at the time. Shortly after the rains began to fall Simpson called J. E. Crain and informed him that the floodgate was closed, that appellee wanted it open and was claiming that damage would be done to his crops. Crain then told Simpson that he would send J. W. Meyer over to see about the matter. Meyer did not come until October 11, 1949, when the floodgate was opened and the flood waters, which had covered the matured rice for several days, began to recede and the lands were drained within two or three days thereafter.

The appellants introduced testimony in opposition to the foregoing facts as established by the proof on behalf of appellee. There was also a large volume of conflicting evidence relative to the extent of the damages to appellee's crop by the flooding of the rice; also as to whether any damages could have been sustained even if there had been no closure of the floodgate. Appellee, who was an experienced rice grower, testified that the closing and delayed opening of the gate caused flood damages in excess of $20,000.00 to about 400 acres of rice and introduced detailed memoranda showing the estimated and actual yields, damages, harvesting costs, etc. His testimony was corroborated by that of several other rice growers in the vicinity but was sharply disputed by witnesses for appellants.

Appellants' first two contentions for reversal are based on the trial court's refusal to give appellants' requested Instruction No. 8 which reads:

"An owner has the right to obstruct drainage on his own property in any manner he sees fit, provided he does not thereby interfere with property of his neighbors. In this case, Lee Wilson and Company built a levee across Greasy Slough at a time when it owned all of the surrounding lands. Thereafter it sold the levee and enclosed lands to Greasy Slough Outing Club, Inc. Lee Wilson and Company thereby created a servitude on its own lands and an easement in favor of Greasy Slough Outing Club, Inc., to the extent, if any, that the levee interfered with the natural flow of Greasy Slough. The Plaintiff, Amick, rented the farm land of Lee Wilson and Company with notice of all the facts and took it subject to prior rights and easement of Greasy Slough Outing Club, Inc. Amick, therefore, has no right to complain of interference with flowage of Greasy Slough, if there was any, by reason of this easement, and your verdict will be for the Defendants."

It should first be noted that appellants did not plead an implied easement and that the requested instruction is peremptory in nature. Appellants argue that the channel of Greasy Slough was permanently closed by the levee in 1942 when Lee Wilson & Co. owned both the agricultural lands and duck hunting reservoir; that this condition remained unchanged until 1945 when the company sold the reservoir to the Outing Club which became the dominate estate and the remaining lands of the grantor became the servient estate; that the Outing Club thereby acquired an implied easement giving it the right to obstruct Greasy Slough and to impose upon the agricultural lands to the north any flooding that might result therefrom; and that appellee, having leased the lands with full knowledge of such facts, was as a matter of law without right to complain if he suffered any injuries therefrom. The rules relied on by the appellants have been announced and applied in numerous cases. Some of these are: *Cherry* v. *Brizzolara*, 89 Ark. 309, 116 S. W. 668; *Board of Directors of St. Francis Levee District* v. *Barton*, 92 Ark. 406, 123 S. W. 382; *C. R. I. and P. Ry. Co.* v. *Humphreys*, 107 Ark. 330, 155 S. W. 127,

L. R. A. 1916E, 962; *Kahn* v. *Cherry,* 131 Ark. 49, 198 S. W. 266; *Mo. Pac. R. R. Co.* v. *McGuire,* 205 Ark. 658, 169 S. W. 2d 872.

In *Kahn* v. *Cherry, supra,* this court recognized the general rule relating to implied easements in approving the following statement of the Indiana Court in *John Hancock Mutual Life Insurance Co.* v. *Patterson,* 103 Ind. 582, 586, 2 N. E. 188:

" 'Where, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another, which at the time of the severance is in use, and is reasonably necessary for the fair enjoyment of the other, then, upon a severance of such ownership, whether by voluntary alienation or by judicial proceedings, there arises by implication of law a grant or reservation of the right to continue such use. In such case, the law implies that with the grant of the one an easement is also granted or reserved, as the case may be, in the other, subjecting it to the burden of all such visible uses and incidents as are reasonably necessary to the enjoyment of the dominant heritage, in substantially the same condition in which it appeared and was used when the grant was made.' "

This same principle was approved in the *Brizzolara* case, where the court also approved the holding in *Crosland* v. *Rogers,* 32 S. C. 130, 10 S. E. 874, to the effect, ". . . that, in order to establish an easement by an implied reservation, where there has been a unity of possession and a subsequent sale of a portion of the land over which the easement is claimed, such easement must have been apparent, continuous and necessary, the term 'necessary' meaning there could be no other reasonable mode of enjoying the dominant tenement without the easement; there should be an element of absolute necessity." This holding is in line with the authorities generally as stated in 17 Am. Jur., Easements, § 43:

"As a general rule, if an existing servitude or *quasi* easement can be made the basis for the implication of an easement on the severance of certain property, it is es-

sential that such easement be necessary, and not merely convenient, to the beneficial enjoyment of the dominant portion of the property. Moreover, the necessity at the time of the conveyance governs.''

It is also the rule that whether an easement is continuous or necessary is ordinarily a question of fact for the Jury to decide. 28 C. J. S., Easements, § 71.

In the water flowage cases relied on by appellants there was no question but that the obstruction, in the form of a solid embankment or levee, was permanent, continuous, complete, unaltered and necessary to the beneficial enjoyment of the dominant estate. But in the case at bar there was testimony warranting a contrary finding by the Jury. There was sufficient evidence here to sustain a finding that the obstruction was altered by the installation of the floodgate in 1947 so that a flowage of the slough waters could be maintained southward into the reservoir for its beneficial use as a duck hunting area. It was thus unnecessary that a continuous and permanent obstruction of the stream be maintained, and this was recognized by the installation of the floodgate and the assurance to appellee that it could be opened when necessary to the proper cultivation of his rice crop. In these circumstances, we conclude that no error was committed in the refusal to give appellants' requested Instruction No. 8.

In their contention that appellee's action was barred by the three-year statute of limitations, appellants rely on *Board of Directors of St. Francis Levee District* v. *Barton, supra,* and similar cases which hold that where a solid levee continuously and permanently obstructs drainage, the injury is an original one, and the statute of limitations begins to run from the construction of the levee, and a subsequent tenant who had no interest in the lands at the time of the injury has no cause of action on account of the overflow of his crops. Again appellants overlook the fact that there was sufficient evidence to warrant a finding in the instant case that the obstruction was neither continuous, total nor permanent but was

altered by the installation of the floodgate under an arrangement to keep it open when necessary for the cultivation of the rice crops. Certainly no tort could have been committed by Lee Wilson & Co. when it constructed the levee in 1942 because, being the owner of all the lands, it could not have sued itself. After the conveyance to the Outing Club in 1945 the obstruction was altered and at least made only partial by installation of the floodgate in 1947. In this connection there are many cases involving only a partial obstruction of flowage, insufficient only at certain times, and in which it is held that the statute of limitations is not set in motion until the injury or damage occurs. See *Daniels* v. *Batesville,* 189 Ark. 1127, 76 S. W. 2d 309, and cases there cited. We do not concur in appellants' contention that there was such total and permanent obstruction of the slough in the instant case as to preclude it from falling within the rule of these cases. As we view the pleadings and proof in the instant case no tort arose until the closure and refusal to open the floodgate in October, 1949, in violation of the prior arrangement of the parties. The instant action was filed within three years of that date.

It is next contended that Quincy Jackson was an independent contractor for whose acts, or those of his employees, the appellants are not liable. The question whether Jackson was an independent contractor or a servant of the Outing Club was properly submitted to the Jury and there is substantial evidence to support a finding that he and his employees were servants of the Outing Club in the construction of the secondary levee.

Appellants also insist that the damages were based on speculation and conjecture; and that the verdict is excessive. As previously indicated, the question of the amount or extent of appellee's damages was sharply disputed but there was nevertheless substantial evidence to support the Jury's finding. There is conflicting testimony from which the Jury could have either found that the damages were heavier than the amount recovered; or that the appellee sustained no damage at all. The Jury's

acceptance of the testimony offered by appellee on this issue is binding on this court.

It is also argued that none of the appellants either directed or participated in the closing of the floodgate and, therefore, cannot be held liable for the damages caused thereby, if any. As to the appellant, J. H. Crain, it was shown that he generally had and exercised supervisory control over the three corporations. But it is undisputed that, for several weeks before and after the closing of the floodgate, he was ill and knew nothing about the immediate transactions out of which this action grew until long after they occurred. Also it may be fairly inferred from the evidence that the injury to appellee and the consequent lawsuit would not have occurred if he had been well and on the job. A majority of the court are also of the opinion that the evidence is insufficient to sustain a finding of liability against the other individual appellants, J. E. Crain, Lowell Simpson and John W. Meyer.

The judgment against appellant, Greasy Slough Outing Club, is accordingly affirmed. The judgment against the other appellants is reversed and, the cause having been fully developed, it is dimissed as to them.

GRIFFIN SMITH, C. J., HOLT and ROBINSON, JJ., dissent from the affirmance.

ROBINSON, J., dissenting. There are only two issues raised by the pleadings in this case; first, appellee, plaintiff in the circuit court, alleges that the defendants, appellants here, negligently obstructed a natural drain. The appellants, defendants in the circuit court, deny this allegation and plead the statute of limitation. The pleadings were never amended or treated as amended, and no other issue was submitted to the jury. There should have been a directed verdict for the defendant, the Greasy Slough Outing Club.

The obstruction across Greasy Slough was constructed by Lee Wilson & Co. in 1942, at which time that company owned the property now owned by the Greasy

Slough Outing Club and the adjoining property leased by appellee Amick in 1947-48. The conveyance to the outing club was in 1945, three years after the obstruction was built across Greasy Slough. Lee Wilson & Co., at the time the obstruction was built, owned all of the property involved in this litigation; it owned the property which was later conveyed to Greasy Slough Outing Club in 1945 and owned the property later leased to appellee Amick in 1947-48. There is no contention on the part of anyone that Lee Wilson & Co. did not have the right to build an obstruction across Greasy Slough in 1942 when it owned all of the land affected in any manner whatsoever by the obstruction. Amick did not lease any of the land from Lee Wilson & Co. until 1947, five years after the obstruction had been built across Greasy Slough. So far as Amick was concerned Greasy Slough was no longer a natural drain; the obstruction had been built across it by one who had a perfect right to do so.

It is true that in 1947 the Greasy Slough Outing Club placed a 48-inch culvert in the obstruction that had been built across Greasy Slough previously; but there is not a scintilla of evidence to the effect that the hunting club installed this culvert for any purpose other than to facilitate the flooding of its own property when so desired. A flood gate was placed in the end of this culvert to control the flow of water at the will of the hunting club. There was no obligation on the part of the hunting club to open the flood gate for the benefit of Amick.

The obstruction was there when Amick leased the property, and he had no dealings whatever with the hunting club. The hunting club owned no interest whatever in the lands leased by Amick. The club was not a party to Amick's lease, and it is not shown that any duly authorized agent of the hunting club ever at any time had any contact with Amick. Amick did not at any time pay to the hunting club one dime in consideration of anything. To say that the hunting club had no right to control the flow of water onto its grounds might destroy the usefulness of the property for the very purpose for which it was purchased.

·"Lee Wilson & Co. sold the land to the hunting club with the obstruction across Greasy Slough in place. It could hardly be contended that the company could now come in and say "remove the obstruction." In fact, no one contends that the company would have any such right; and if the company does not have the right to require Greasy Slough Outing Club to remove the obstruction, its tenant does not have that right.

Therefore, in my opinion, Amick, the tenant of Lee Wilson & Co., has no cause of action whatever against the Greasy Slough Outing Club.