Lois M. BLACK and Marlin Black *v.*
Linda VAN STEENWYK

97-1096                                        970 S.W.2d 280

Supreme Court of Arkansas
Opinion delivered June 18, 1998
[Petition for rehearing denied September 10, 1998.]

*Anthony W. Black* and *Steven D. Durand*, for appellants.

*William H. McKim*, for appellee.

RAY THORNTON, Justice. This is a dispute between sisters about the right to use a roadway connecting appellee Linda Van Steenwyk's home to a county road. The roadway crosses land owned by her sister, Lois M. Black, and Marlin Black, appellants. From the chancellor's decree granting appellee an easement to use the roadway as established, appellants bring this appeal, asserting also that the chancellor should have recused. We find no reversible error and affirm.

In the early 1950s, W.D. and Lura Gaston, the parents of the sisters, obtained the county's assistance in building a "new road" across their 160-acre farm, connecting their home place to a

county road. The new road was maintained and improved with the assistance of Montgomery County road crews. Its construction led to the abandonment of an old access road to the home place, which crossed the South Fork of the Ouachita River at an unimproved ford and which could be traversed only at times of low water. From the time of its construction until the Gastons divided the farm between their sons and daughters, this new road was used by the public, visitors, and others who called on the Gastons at their home place.

In 1969, the Gastons divided their farm among their children. Forty-three acres, which included the old home place, was conveyed to appellee and her husband. A brother, Billy Gaston, was given forty acres on which part of the new road was situated, and appellants were given thirty-seven acres. Another brother was given a share of the farm, which is not involved in this proceeding. In 1970, appellants bought the forty-acre tract, which had been conveyed to Billy Gaston. The new road, which continued to serve the home place, crossed the property owned by appellants. Since the time both parties have lived on their respective properties, appellee has used the new road to access her home and property.

The present dispute arose in 1993, when the appellee listed her property for sale. Appellants objected to appellee's representation to the realtor that access to her property was to be gained by the new road. Appellants claimed that the road was their "private driveway," that appellee used the road with their permission, and that appellee had no rights in the road that could be conveyed with her property.

On March 21, 1994, appellee filed a petition to quiet title to the portion of the roadway that runs across appellants' land. Appellee alleged that she was entitled to an easement by necessity, an easement by implication, and an easement by prescription over the roadway. Appellants defended the suit, claiming that the Gastons conveyed the properties simultaneously without reserving or granting an easement, that appellee's property is not landlocked but is serviced by and fronts onto a county road, that a secondary road, located entirely on the appellee's property, connects her land

to a county road, and that they gave appellee permission to use the roadway.

Chancellor Gayle Ford held a bench trial on April 19, 1996. On June 5, 1996, prior to the entry of a judgment in this matter, appellants filed a motion asking Chancellor Ford to recuse from the case. Appellants alleged there was an appearance of impropriety based on the existence of an undisclosed landlord-tenant relationship between Chancellor Ford and Mr. McKimm, attorney for appellee. By letter opinion dated December 26, 1996, Chancellor Ford, without holding a hearing on the motion, declined to recuse and announced his ruling granting appellee an easement in the existing roadway across appellants' property. On May 5, 1997, the court entered judgment in favor of appellee.

On appeal, appellants argue that appellee is not entitled to an easement over the roadway under any theory, that the chancellor should have held a hearing on their motion to recuse, and that the chancellor should have recused.

## I. Easement

For their first point on appeal, appellants challenge the chancellor's decree granting appellee an easement over the roadway by asserting that the evidence is insufficient to support an easement under any of the theories alleged by appellee. In her petition to quiet title, appellee pled that she was entitled to an easement over the roadway by necessity, by implication, and by prescription. The chancellor did not enter specific findings of fact or conclusions of law but simply granted appellee's petition establishing an easement over the roadway where it is presently located. However, statements that the chancellor made in his letter opinion, which seem to imply a finding of necessity, together with the fact that he granted the easement where the roadway was already located, suggest that his decree must have been predicated upon the finding of an easement by implication. From our *de novo* review, we conclude that such finding would not be clearly erroneous or contrary to a preponderance of the evidence. *Maroney v. City of Malvern*, 320 Ark. 671, 899 S.W.2d 476 (1995). There-

fore, we need only address the arguments raised by appellants against an implied easement.

Appellants contend that the appellee should not be granted an easement by implication over the roadway because the Gastons simultaneously conveyed the property to appellee and appellants' predecessor in title, did not retain any interest in the land, and failed to specifically grant or reserve an easement in favor of appellee. They also argue that an easement is not essential nor an absolute necessity because there are other ways to gain access to appellee's property from the county road.

In *Manitowoc Remanufacturing, Inc. v. Vocque*, 307 Ark. 271, 819 S.W.2d 275 (1991), we explained that when an owner of a single parcel of land uses one part of his land for the benefit of another part, it is often said that a quasi-easement exists. The land benefitted is referred to as the quasi-dominant tenement, and the land used for the benefit of the other is referred to as the quasi-servient tenement. *Id.* at 276, 819 S.W.2d at 278 (citing 3 Tiffany, *The Law of Real Property* § 781 (1920)). Upon a conveyance of the quasi-dominant tenement, an easement corresponding to the preexisting quasi-easement or, simply, an easement by implication is vested in the grantee. *Id.; Patterson v. Buffalo National River*, 76 F.3d 221, 226 (8th Cir. 1996).

In *Greasy Slough Outing Club, Inc. v. Amick*, 224 Ark. 330, 274 S.W.2d 63 (1954)), we stated the general rule relating to implied easements as follows:

> Where, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another, which at the time of the severance is in use, and is reasonably necessary for the fair enjoyment of the other, then, upon a severance of such ownership, whether by voluntary alienation or by judicial proceedings, there arises by implication of law a grant or reservation of the right to continue such use. In such case, the law implies that with the grant of the one an easement is also granted or reserved, as the case may be, in the other, subjecting it to the burden of all such visible uses and incidents as are reasonably necessary to the enjoyment of the dominant heritage, in substantially the same condition in which it appeared and was used when the grant was made.

*Id.* at 337, 274 S.W.2d at 67 (internal quotes omitted). *See also Manitowoc Remanufacturing,* 307 Ark. at 277, 819 S.W.2d at 278-79; *Kennedy v. Papp,* 294 Ark. 88, 93-94, 741 S.W.2d 625, 628 (1987).

Thus, the finding of an easement by implication does not depend upon whether the Gastons made an express grant or reservation of an easement in the conveyance. Rather, an easement by implication may be found if appellee met her burden of proving the elements as outlined in *Greasy Slough Outing Club* and subsequent cases. In addition, the fact that appellee and appellants acquired title to their properties through a simultaneous conveyance does not preclude the finding of an implied easement. On the contrary, implied easements are most readily inferred when the easement is claimed by one simultaneous conveyee against another. *See Restatement of Property* § 476, comment f (1944). ("It is reasonable to infer that a conveyor who has divided his land among simultaneous conveyees intends that very considerable privileges of use shall exist between them. Commonly, in such cases, the conveyance constitutes a family distribution, and, where this is true, the probability of a desire that existing conveniences shall continue to be operative is greater than the probability that a conveyor would desire them continued as against himself.")

From the foregoing, we must now decide if appellee presented sufficient evidence to show that she is entitled to an implied easement over the roadway in question. Several witnesses testified that the new roadway was in existence and used for ingress and egress to the Gastons' home site for many years prior to the 1969 conveyances. Billy Gaston testified that when the new roadway was built around 1951, it became the main route of access to the home. He further testified that at the time the property was divided, there was no other practical, reasonable or regularly useable means of access to the Gastons' home. Appellee also testified that since the time of its construction, the new road was used in order to gain access to the home. Finally, appellant Lois Black testified on cross-examination that the new roadway was in use when the land was divided.

The testimony below also indicated that the use of the roadway was open and continuous, and that there was no other reasonable means of access to the property. Although several witnesses testified that an original road leading to the home was used occasionally over the years, the testimony also reflected that the original road was all but abandoned after the new road was built because the original roadway crosses the South Fork of the river and its flood plain at an unimproved ford. Billy Gaston testified that he stopped using the old roadway because he got stuck going across the stream. Appellee testified that after the new road was built, the original roadway was used a few times; however, she further testified that the original roadway was becoming impassable and that people using it would get stuck or their vehicles would drown out while crossing the stream.

Notwithstanding the testimony about the difficulties associated with gaining access to appellee's land by way of the original roadway, appellants maintain that the easement is not necessary because the property is not landlocked. The testimony below revealed that the eastern portion of appellee's property shares a 1300 foot boundary with a county road. However, accessing appellee's home and the majority of her property from the county road is made difficult because of the existence of the stream, which runs through the eastern portion of her land. The witnesses testified that the land lying between the county road and the South Fork of the river is a flood plain, several hundred feet wide and constituting a minor portion of appellee's property. In order to gain access to appellee's home and the bulk of her property from the county road, one must travel across the flood plain and the stream, which has no bridge.

■ ■ Whether an easement is necessary is a question of fact. *Greasy Slough Outing Club, Inc.*, 224 Ark. at 338, 274 S.W.2d at 68. We have held that "necessary" means there could be no other reasonable mode of enjoying the dominant tenement without the easement. *Manitowoc Remanufacturing*, 307 Ark. at 277, 819 S.W.2d at 279. In this case, the chancellor viewed the property in question and concluded that the old road was impassable and would be impassable during a portion of the year because of the stream unless a large bridge was constructed. We are unable to

say, from this record, that the chancellor's finding with respect to element of necessity is clearly erroneous or against a preponderance of the evidence. Accordingly, we conclude that the evidence before the trial court was sufficient to support the chancellor's decree granting the easement.

## II.    Recusal

Appellants' final point of appeal is that the chancellor committed reversible error by failing to hold a hearing on their motion for recusal and by declining to recuse. We disagree that the action or inaction of the chancellor reflects an abuse of discretion requiring reversal and a new trial.

This petition to quiet title was filed in March of 1994, and resulted in a bench trial before Chancellor Gayle Ford on April 19, 1996. Following the trial, but before the entry of a judgment, appellants filed on June 5, 1996, a motion asking the chancellor to recuse. The motion to recuse alleged that appellants had learned that the office building in which appellee's attorney, Mr. McKimm, had his law offices belonged to Chancellor Ford and his wife, and stated: "While the Respondents (appellants) do not allege any impropriety on the part of the Court, judicial canons mandate that a judge shall avoid the appearance of impropriety . . . ." The motion further stated that the ownership of the building in which appellee's counsel's law offices are located "gives rise to an appearance of impropriety and serves as the basis for which the Court's impartiality might reasonable be questioned."

Appellee's response to the motion asserted that appellants had known of the location of his office throughout the proceedings, and the motion was untimely after evidence had been presented at trial and briefs had been provided to the court. Appellants replied and agreed they had known the location of McKimm's office, but had not known the building belonged to Chancellor Ford and his wife. Appellants attached to this pleading a Real Estate Record Card from the Tax Assessor's office indicating ownership of the property by the Chancellor and his wife, and a diagram of the

parcel, showing the names of U.S. Dept. of Agriculture, Ouachita Production Credit Association, and William H McKimm.

The chancellor entered no official order disposing of appellants' motion. However, in his letter opinion dated December 26, Chancellor Ford stated that he had previously concluded that there was no reason requiring him to recuse in the matter, which had previously been tried.

Appellants contend that the chancellor's failure to hold a hearing on their motion for recusal requires reversal of his decree granting appellee an easement. In support of this contention, appellants cite *City of Jacksonville v. Venhaus*, 302 Ark. 204, 788 S.W.2d 478 (1990) and *Westbrook v. State*, 265 Ark. 736, 580 S.W.2d 702 (1979), wherein we held that it was error not to hold a hearing on a motion for recusal. However, we have also affirmed a chancellor's decision not to recuse where no hearing was held on the motion. In *Dolphin v. Wilson*, 328 Ark. 1, 5, 942 S.W.2d 815, 818 (1997), we said:

> [N]o hearing was held on the issue of recusal, and none was requested. The decision on the part of a judge not to recuse is affirmed when there is no abuse of discretion. *Reed v. State, supra*. Mrs. Dolphin did nothing more on this issue than file a motion making the assertions described above [alleging the recent existence of a law partnership between the chancellor and a party to the litigation], and the chancellor denied the motion without comment, so we have little information in the record. Because Mrs. Dolphin has not met her burden of proving that [the chancellor] was biased, we must conclude that the chancellor did not abuse her discretion in failing to recuse from the case.

While the chancellor's failure to provide a hearing would cause serious concern if appellants had sought a hearing, there is no showing or allegation in the record that such a hearing was requested. In this respect, we note that appellants have endeavored to call to our attention copies of letters addressed to the chancellor and his staff in which they inquired about the status of their motion and what action would be appropriate or necessary in addressing the motion. However, these letters are not part of the record or supplemental record filed in this case, and we have consistently refused to consider on appeal matters outside of the

record. *Burkhalter v. State*, 330 Ark. 684, 956 S.W.2d 171 (1997). Under the facts of this case, we cannot say that the chancellor's decision on the merits of this case should be reversed because appellants did not get a hearing on their motion for recusal.

We next consider appellants' contention that Chancellor Ford erred in failing to recuse to avoid the appearance of impropriety. Canon 2(a) of the Arkansas Code of Judicial Conduct provides that a judge shall avoid impropriety and the appearance of impropriety. Canon 3(e) requires a judge to disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including where the judge has a personal bias or prejudice concerning a party or a party's lawyer. However, a judge's decision not to recuse is a discretionary one and that decision will not be reversed on appeal absent a showing of an abuse of discretion. *Beshears v. State*, 329 Ark. 469, 947 S.W.2d 789 (1997). To decide whether there was an abuse of discretion, we review the record to determine if any prejudice or bias was exhibited. *Dolphin*, 328 Ark. at 4, 942 S.W.2d at 817. The question of bias is usually confined to the conscience of the judge. *Id.* Judges are presumed to be impartial, and the party seeking disqualification has the burden of showing otherwise. *Id.*

We have carefully reviewed the record for showings of bias, and have looked at the charge that bias was demonstrated by the chancellor's grant of a second motion for continuance requested on the basis of Mr. McKimm's assertion of health problems. Counsel for appellants would take us outside the record to show a newspaper article reporting that Mr. McKimm was attending a conference during part of this continuance.

We do not rely upon newspaper articles that have not been made a part of the record for a showing of bias, but we observe that even if the granting of the continuance may have been lenient, it does not rise to the level of bias or prejudice required for us to reverse a decision on the merits and disqualify a trial judge for abuse of his discretion in declining to recuse. In *Noland v. Noland*, 326 Ark. 617, 932 S.W.2d 341, (1996) we stated that absent some objective demonstration of prejudice, it is a communication of bias which will cause us to reverse a judge's

decision on disqualification. *Id.* at 620, 932 S.W.2d at 343 (citing *Matthews v. Rodgers*, 279 Ark. 328, 331, 651 S.W.2d 453, 455 (1983)).

▮ Appellants also suggest that Chancellor Ford issued his adverse decision only after they had forwarded a complaint against him to the Judicial Discipline and Disability Commission. The record before the court does not support this contention. The record does not contain any evidence concerning appellants' complaint to the Commission; further, there is nothing in the record to show that appellants had referred the matter to the Commission when Chancellor Ford issued his letter opinion on December 26, or that he was aware of such complaint when he issued his decision. Accordingly, we do not consider this alleged evidence of bias because it is based on matters not contained in the record. *Burkhalter*, 330 Ark. 684, 956 S.W.2d 171.

▮ From our review of the record before us, we find no evidence of the communication of bias or prejudice. While we have concerns about the assertion of a landlord–tenant relationship, we have found no evidence of bias or prejudice in the record that would lead us to conclude that the chancellor's decision not to recuse was an abuse of discretion requiring his disqualification and a reversal of the case on the merits.

For the reasons above, we affirm the decision.

NEWBERN, BROWN, and IMBER, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. This case highlights the issue of whether a trial judge should disqualify from hearing a matter when the trial judge is in an ongoing business relationship with one of the attorneys appearing before him. Here, that business relationship was one of landlord/tenant as shown by a real estate tax record attached to the Blacks' reply to Van Steenwyk's response to the motion to disqualify. I believe the trial judge should have disclosed his business relationship with opposing counsel, and, because the landlord relationship with counsel apparently existed, he should have disqualified. Moreover, I believe that moving counsel was entitled to a prompt decision on

his motion suggesting that the trial judge recuse, and that that was denied him.

The Blacks' motion to recuse was filed on June 5, 1996. The trial judge's letter opinion was dated December 26, 1996. No discussion of the issue was included in the trial judge's letter opinion, much less any admission that the trial judge was opposing counsel's landlord. The trial judge simply said: "Having previously concluded that there is no reason requiring me to recuse in the matter which has previously been tried, I now must make the distasteful decision regarding Mrs. Van Steenwyk's ingress and egress to her property." The record does not reflect that the trial judge previously made public his conclusion on disqualification in any written form or by ruling. Certainly, no order to that effect is included in the record. Thus, the motion was denied almost 7 months after the request to disqualify was made by passing reference in a letter opinion issued by the trial judge in which he disposed of the merits of the case.

The Arkansas Code of Judicial Conduct requires that a judge disqualify in any proceeding where his or her impartiality might reasonably be questioned. Ark. Code Jud. Conduct, Canon 3E(1). The Commentary to that Section reads:

> A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there is no real basis for disqualification.

Here, that was not done. The Code further mandates that a judge "shall not engage in financial and business dealings that: . . . (b) involve the judge in frequent transactions or continuing business relationships with those lawyers or other persons likely to come before the court on which the judge serves." Ark. Code Jud. Conduct 4D(1)(b). The Code, in addition, requires that the judge's financial interests that might cause frequent disqualification should be divested. Ark. Code Jud. Conduct 4D(4). One treatise on judicial conduct makes the point succinctly: "Similarly, a judge must disqualify himself or herself when he or she has a business relationship with an attorney appearing before the court." Sha-

man, Lubet & Alfini, JUDICIAL CONDUCT AND ETHICS, (2nd ed. 1995) § 4.19, p. 135.

Two advisory opinions have issued from the Judicial Ethics Advisory Committee on whether the judges requesting advice should disqualify when those judges have a landlord/tenant relationship with one of the attorneys appearing before them.[1] In both instances, the Ethics Advisory Committee answered "yes." *See* Advisory Opinion #97-03 requested by Hon. Charles A. Yeargan (May 6, 1997); Advisory Opinion #97-05 requested by Hon. Lance Hanshaw (January 5, 1998). In each opinion, the Ethics Advisory Committee concluded that the judge should either recuse or, alternatively, ask the parties and their lawyers whether they wish to waive the judge's disqualification under Canon 3F. Though those advisory opinions are not binding on this court, they illustrate the serious perception problem by any reasonable person when a lawyer who has ongoing business dealings with the trial judge argues a case before that same judge.

The majority opinion effectively guts those advisory opinions and places an interpretive gloss on the Code of Judicial Conduct without even discussing the two Canons involved or the advisory opinions themselves. Under these facts, the trial judge should have advised opposing counsel of the landlord/tenant relationship and disqualified, subject to the parties and attorneys waiving disqualification under Canon 3F.

The majority opinion is further delinquent in never really coming to grips with and discussing the ongoing landlord relationship itself between the trial judge and counsel as a basis for disqualification. Rather, the majority hangs its decision on the Blacks' failure to request a hearing on their motion to recuse and the absence of proof of bias in the record. The Blacks presented the trial judge with a real estate tax record, and the trial judge certainly knew the status of the landlord/tenant relationship. Having this matter turn on whether the Blacks asked for a hearing seems to be an unnecessary technicality under these circumstances.

---

[1] The Judicial Ethics Advisory Committee was established by procedural rule adopted by the Arkansas Judicial Discipline and Disability Commission pursuant to Section 5 of Act 791 of 1991.

With regard to proof of bias, the Michigan Court of Appeals has held that actual bias need not be shown when the judge had a joint-ownership interest in land on which the main office of the law firm of one of the trial attorneys was located. *See In Re Disqualification of Fiftieth District Court Judge*, 483 N.W.2d 276 (Mich. App. 1992). I question whether proof that the trial judge was actually biased is required in a case where the judge is doing business with one of the trial attorneys.

Moreover, the trial judge should have made the recusal decision expeditiously and not delayed the matter for 7 months. It is axiomatic that recusal decisions should be acted on promptly. *See* 48A C.J.S. JUDGES, § 145, p. 842. Indeed, some jurisdictions provide that so long as the issue of disqualification remains undecided, the judge is without jurisdiction to hear any matter affecting the substantive rights of the parties. *People v. Bell*, 658 N.E.2d 1372 (Il. App. Ct. 1995); *Greenberg, Benson, Fisk and Fielder, P.C. v. Howell*, 685 S.W.2d 695 (Tex. Ct. App. 1984); *Johnson v. The District Court*, 674 P.2d 952 (Colo. 1984). Here, though, there is nothing in the record to show that he made an earlier ruling or advised moving counsel of his prior decision.

This is all made especially troublesome because the Van Steenwyk's counsel, who was the judge's tenant, initially responded to the Blacks' motion for recusal by denying the paragraph of the motion where the landlord/tenant relationship was asserted. The Blacks replied with the tax record showing that the trial judge owned the building where the trial attorney had his office. In the Van Steenwyk's brief in this appeal, she states that the landlord/tenant relationship between the trial judge and counsel was admitted. However, no such admission appears in the record. Indeed, no where is the relationship defined by the trial counsel or the trial judge or explained in either the trial judge's letter opinion, his judgment, or in any other document in the record. Van Steenwyk also contends in her brief that the Blacks should have obtained a ruling on their motion to recuse. The Blacks' counsel responds that he tried. And, again, this was a matter for the trial judge's prompt consideration and decision.

These issues go to the heart of the perception of judicial independence and impartiality. The decision in this case should

not turn on whether the Blacks' attorney requested a hearing on the recusal motion. It should turn on the merits of whether the trial judge abused his discretion (1) in refusing to disclose a landlord/tenant relationship with counsel or even to discuss whether it existed after the motion to recuse was filed, (2) in refusing to disqualify due to his ongoing landlord relationship with trial counsel under the Code of Judicial Conduct or, alternatively, in failing to obtain a waiver from counsel and their clients, and (3) in not considering the recusal motion and promptly disposing of it, giving reasons for his decision. I conclude that for all these reasons there was an abuse of discretion by the trial judge in this case. I respectfully dissent.

NEWBERN and IMBER, JJ., join.