SEECO, INC., Arkansas Western Gas Company,
and Southwestern Energy Company *v.*
Allen HALES, Mary Nelle Hales,
Robert G. Jeffers, David P. Taylor, and
Taylor Family Limited Partnership "A"

99-800 22 S.W.3d 157

Supreme Court of Arkansas
Opinion delivered June 22, 2000
[Substituted opinion delivered July 13, 2000.]

*Don Langston*, Judge;

*Everett Law Firm*, by: *John C. Everett*; *John J. Watkins*; *Friday, Eldredge & Clark*, by: *Robert S. Shafer*, *Kevin A. Crass*, and *Jonann E. Coniglio*; and *Inhofe & Jorgenson*, by: *J. David Jorgenson*, for appellants.

*Williams & Anderson LLP*, by: *Leon Holmes*; *Marilyn J. Eickenhorst*; *Gable & Gotwals*, by: *M. Benjamin Singletary* and *Oliver S. Howard*; and *Smith, Maurras, Cohen, Redd & Horan, PLC*, by: *Don A. Smith* and *S. Walton Maurras*, for appellees.

R OBERT L. BROWN, Justice. The appellants, SEECO, Inc. (SEECO), Arkansas Western Gas Company (AWG), and Southwestern Energy Company (SWN) appeal an adverse jury verdict and judgment which awarded the class of royalty owners $62,136,827 in compensatory damages and $31,085,330 in pre-judgment interest for a total award of $93,222,157. The appellants raise sixteen issues on appeal. We find no reversible error in the issues raised, and we affirm the judgment.

This is the fourth appeal to come before us in this case. In *SEECO, Inc. v. Hales*, 330 Ark. 402, 954 S.W.2d 234 (1997) (*SEECO I*), we affirmed the certification of a class of royalty owners in litigation brought against appellants SEECO, AWG, and SWN. In *SEECO, Inc. v. Hales*, 334 Ark. 134, 969 S.W.2d 193 (1998) (*SEECO, II*), we affirmed the trial judge's disqualification of co-counsel for SEECO, AWG, and SWN from participating in this case because he had announced his candidacy for the same judicial position held by the trial judge. In *SEECO, Inc. v. Hales*, 334 Ark. 307, 973 S.W.2d 818 (1998) (*SEECO III*), we affirmed the trial judge's notice order to a subclass of royalty owners, which had the effect of permitting the trial to proceed as scheduled.

Appellants SEECO and AWG are wholly-owned subsidiaries

of appellant SWN.[1] Appellees are royalty owners by virtue of their oil and gas leases with SEECO and class representatives of approximately 7,000 lessors of oil and gas leases held by SEECO ("royalty owners"). SEECO is a gas producer and leases gas properties from the royalty owners. AWG is a public utility that buys gas from SEECO and in turn furnishes gas to its ratepayers. SWN is the holding company for its two affiliates, SEECO and AWG. At all relevant times, Charles Scharlau was the Chairman of the Board and CEO for the holding company and its two subsidiaries.

On July 24, 1978, SEECO and AWG entered into a 20-year contract for the sale of gas produced from leases held by SEECO, known as Contract 59. Pursuant to Contract 59, SEECO dedicated substantial gas reserves in Franklin, Johnson, Washington, Logan and Crawford Counties to AWG. In return, AWG promised to pay the market-value price throughout its 20-year term. The volume requirements set forth in the contract were intended to fully deplete all of SEECO's dedicated gas reserves by the end of Contract 59's twenty-year term. The contract contained a take-or-pay obligation, which provided that AWG would buy a certain volume of gas at the contract price or pay a specified price without taking the gas.[2] The pricing terms and other provisions of Contract 59 were approved by the Arkansas Public Service Commission (APSC) in 1979, and both SEECO and AWG confirmed to APSC that the two companies would be guided by the terms of the contract.

On December 10, 1984, AWG, by a letter from its Chairman of the Board and CEO, Charles Scharlau, to SEECO froze the price of gas purchased from SEECO at $3.85 per thousand cubic feet (Mcf.). On January 16, 1990, AWG filed an application with the APSC for approval of a general change in its rates and tariffs. On December 21, 1990, the APSC approved the overall revenue requirement and associated tariffs. However, the APSC expressed

---

[1] In 1978, the public utility company known as Arkansas Western Gas Company reorganized into a holding company and changed its name to Southwestern Energy Company. The gas production business and leasehold interests were transferred to SEECO, Inc., and the public utility business was transferred to the re-named Arkansas Western Gas Company.

[2] A "take-or-pay" clause is defined as a clause in a gas purchase contract which requires the purchaser to take, or failing to take, to pay for the minimum annual contract volume of gas which the producer-seller has for delivery. Under this clause, the purchaser usually has the right to take the gas paid (but undelivered ) in succeeding years. Williams & Meyers, *Manual of Oil and Gas Terms* 976 (7th Ed. 1987).

concern over AWG's gas purchasing practices, its affiliate transactions with SEECO, its allocation of gas costs, and its transportation practices. The APSC initiated proceedings to address these issues, and following those proceedings, it issued Order No. 41 on November 29, 1993, in which it addressed the propriety of AWG's contracting practices with SEECO. The APSC specifically noted that it must decide whether the market prices set in Contract 59 were reasonable so to allow them to be passed on to AWG's ratepayers. In its Order No. 41, the APSC found that the relationship between SEECO and AWG was "fraught with conflicts of interest." It further found that AWG was not in compliance with Ark. Code Ann. § 23-15-103 (1987), the least cost purchasing statute[3]. The APSC ordered that for purposes of the cost of gas charged to its Arkansas ratepayers, AWG's purchases from SEECO under Contract 59 must henceforth be indexed to an appropriate market price based on published prices. On October 31, 1994, AWG, SEECO, the APSC, the Arkansas Attorney General, and the Northwest Arkansas Gas Consumers entered into a Stipulation and Agreement whereby Contract 59 was amended to reflect the APSC's findings in Order No. 41. The APSC published this stipulation in its Order No. 52 on January 5, 1995. As part of the Stipulation and Agreement, SEECO agreed to waive all take-or-pay pricing, buy-down demands, and other contractual claims arising under Contract 59 prior to July 1, 1994.

On May 24, 1996, Allen Hales and the other named appellees filed suit on behalf of themselves and other similarly situated royalty owners under SEECO gas leases, asserted numerous causes of action in contract and tort, and claimed royalty payments due from SEECO and not paid. Their claims arose out of SEECO's administration of several contracts entered into between SEECO and AWG. The royalty owners later amended their complaint to focus solely on claims arising out of Contract 59.

---

[3] That statute reads:

All gas lines or companies operating within the state who render a domestic or general service to the public in the furnishing and sale of gas are required to buy or furnish from the lowest or most advantageous market. Failure to do so shall deprive them of the difference in price between the market price and the price at which the purchase is made. Ark. Code Ann. § 23-15-103 (1987)

In their complaint, the royalty owners alleged that throughout the term of Contract 59, SEECO never requested nor required AWG to pay the market price or take the volumes of gas set out under the express terms of the contract. The complaint also referred to the fact that in 1984, AWG froze the price of gas to be paid SEECO for gas produced and sold under Contract 59. The royalty owners asserted that this freeze violated the pricing provisions of Contract 59, and they contended that SEECO did nothing to contest the price freeze implemented by AWG. Because the price freeze was not to SEECO's advantage, the royalty owners asserted that the freeze was only implemented to benefit AWG and significantly reduced the amount of royalty payments the royalty owners would receive under Contract 59.

The royalty owners further alleged causes of action in tort. As part of the fraud and constructive fraud claims, the complaint contended that in a 1983 letter, SEECO advised certain royalty owners that it had entered into a gas-sales contract with Natural Gas Pipeline (NGP) which would result in reduced royalties. The royalty owners claimed that SEECO failed to disclose that the same gas dedicated under the NGP contract was already dedicated under Contract 59, with its take-or-pay provision, at a significantly higher purchase price. In this same vein, the complaint asserted that in 1987, SEECO solicited the purchase of mineral interests from certain royalty owners and misrepresented the market price for natural gas. In the solicitation letter, SEECO noted that gas prices had been declining in recent years, but, according to the complaint, SEECO failed to disclose that under Contract 59, AWG was obligated to make minimum volume purchases of gas and to pay for that gas at a certain price as part of the arrangement for having the gas reserves dedicated for its use for twenty years. They further claimed that SEECO fraudulently concealed its failures under Contract 59 by intentionally refusing to document the pricing and other deficiencies under the contract and by failing to reveal Contract 59 pricing on check stubs and in the monthly royalty statements.

On June 13, 1996, SEECO, AWG, and SWN moved to dismiss the complaint, alleging that venue was improper in Sebastian County. On July 26, 1996, they filed a Motion to Disqualify the trial judge. In that second motion, they alleged that Judge Don Langston had a financial interest in the lawsuit, because he and his stepmother owned royalty interests under a lease in which SEECO

owned an interest. That lease, according to the motion, was affected by Contract 269, which had been entered into by SEECO and AWG.

On August 1, 1996, the royalty owners filed an amended complaint. In the amended complaint, they removed all claims relating to Contract 269 in which the appellants maintained that the trial judge would be affected financially. After a hearing on the motion to disqualify, the judge denied the appellants' motion. The court then entered a second order, finding that venue was proper in Sebastian County because the royalty owners had sufficiently pled fraud.

On September 30, 1998, this case went to trial. Following a two-week trial, the jury returned a verdict in favor of the royalty owners and found that they had proven their claims for breach of the leases, deceit, constructive fraud, fraudulent concealment, interference with a contractual relationship, and civil conspiracy. The jury awarded damages of $62,136,827. The jury also found in special verdicts that SWN and AWG were alter egos of SEECO. The judge ordered appellants to pay the damages and prejudgment interest, for a total judgment of $93,222,157. After entry of judgment, the appellants filed a Motion for Judgment Notwithstanding the Verdict, and the motion was denied. On that same date, the trial judge entered a Rule 54(b) certification for appeal of this matter, retaining jurisdiction for the purpose of allocating damages among the class members.

*I. Directed Verdict and JNOV Regarding Breach of Leases*

*a. Preservation of Issue.*

The appellants first contend that the trial judge erred in denying their motion for a directed verdict on breach of the SEECO leases and the subsequent motion for judgment notwithstanding the verdict. The crux of the appellants' argument is that (1) in 1993 the APSC, with its Order No. 41, determined that Contract 59 was administered by SEECO for the benefit of the holding company, SWN, and not for the benefit of its affiliate, AWG, and the utility's ratepayers; and (2) the APSC determined that even the price freeze

initiated by AWG in 1984, which exceeded the Contract 59 price, was too high under the least-cost purchasing statute.

In response, the royalty owners argue that the appellants failed to preserve any argument relating to the APSC in their motion for directed verdict at trial. In reviewing that motion made following the royalty owners' case, we agree that there is no specific reference to the APSC's role with respect to Contract 59. Nevertheless, much of the testimony presented by both the royalty owners and the appellants over the course of the two-week trial concerned the APSC's proceedings and orders pertaining to Contract 59 and how that contract impacted the price of gas to AWG's ratepayers. Without question, the appellants concentrated on the APSC proceedings and Orders No. 41 and 52 as a defense to any breach-of-lease claim by the royalty owners. In their motions for a directed verdict on the breach of the leases, the appellants argued that there was no evidence presented by the royalty owners that the lease terms were breached or in any way not complied with. The reason why there was no breach, according to the appellants' theory of the case, is best illustrated by APSC's endorsement of SEECO's administration of Contract 59. We have no doubt that the trial judge was well aware of this aspect of the appellants' defense, and he instructed the jury in Instruction 9 that it could consider the APSC rulings in deciding the case. We hold that the argument of no breach due to APSC's role is sufficiently preserved.

### b. Express Royalty Clauses.

Turning to the merits, the standard of review for the denial of a motion for a directed verdict is whether the jury's verdict is supported by substantial evidence. *Routh Wrecker Serv., Inc. v. Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998). In that case, we stated:

> Substantial evidence is defined as "evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond suspicion or conjecture." *Esry v. Carden*, 328 Ark. 153, 942 S.W.2d 846 (1997). When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. *See Union Pacific R.R. Co. v. Sharp, supra.* In such

situations, the weight and value of testimony is a matter within the exclusive province of the jury. *See id.*

*Id.* at 238, 980 S.W.2d at 243. The same holds true for a motion for judgment notwithstanding the verdict (JNOV). A trial judge may enter a JNOV only if there is no substantial evidence to support the verdict and the moving party is entitled to judgment as a matter of law. *Anselmo v. Tuck,* 325 Ark. 211, 924 S.W.2d 798 (1996).

There were three kinds of gas leases involved in this case: (1) fixed-rate; (2) prevailing-market price; and (3) proceeds. The fixed-rate leases provided that the lessee would pay royalties to the lessor equal to one-eighth (1/8) of the value of gas sold calculated at a rate of three cents per Mcf. The prevailing-market-price leases provided that the lessee would pay royalties at the rate of one-eighth (1/8) of the value of such gas at the rate of prevailing-market prices. The proceeds leases provided that the lessee would pay royalties of one-eighth (1/8) of the proceeds received by the lessee for all gas produced from the leased premises. The appellants first contend that the royalty owners did not prove that SEECO breached the express royalty clauses in the market-price and proceeds leases by not obtaining maximum prices and "takes" under Contract 59. In particular, the appellants maintain that under the price-redetermination provision of the contract as well as the regulatory-out provision, there was no breach as a matter of law.

The relevant clauses of Contract 59 are set forth as follows:

Section 6: PRICE

(A) Subject to the other provisions hereof, including the following Subsection 6(C), Buyer shall pay to Seller the applicable price under the Contract Price Schedule for each Mcf of gas delivered to Buyer hereunder.

....

(C) Notwithstanding the above, it is understood and agreed that the price for gas delivered hereunder may be redetermined at the beginning of each Contract year with each such price redetermination to cover the gas delivered hereunder during the succeeding contract year. Prior to the expiration of the above-described Contract Year, Buyer or Seller may propose by written

notice a contract price for the succeeding period in accordance with the below-described guideline and the information held by Buyer at that time. Upon such approval, the price for the Contract Year for which a redetermination is requested may be agreed upon by the parties, but in the absence of an agreed redetermination the parties shall make a price redetermination for such period in the following manner:

[This section was amended on May 21, 1979. The amended section is set forth here.]

The redetermined price shall be equal to the highest price being paid during any one of the 9th, 10th, or 11th months immediately preceding the accounting period for which redetermination is requested for gas then being purchased in Franklin, Johnson, Logan, Crawford, or Washington Counties, Arkansas, by any purchaser of gas in those counties during the Contract year immediately preceding the Contract year for which the redetermination is requested.

[The following section was also amended on May 21, 1979.]

Notwithstanding the above provisions, it is agreed that Buyer shall not pay Seller for any gas sold pursuant to this Contract more than the maximum lawful price for such gas as it may be classified under the provisions of the Natural Gas Policy Act of 1978.

....

(F) It is further provided that should Buyer at any time be prohibited by the Public Service APSC of Arkansas, . . . or by any other federal or state legislative or regulatory action, from including the full amount of the applicable contract price provided for above in computing the cost of purchased gas adjustment to be applied to the rates charged Buyer's customers, then Buyer may propose by written notice to Seller that the price to be paid to Seller hereunder shall thereafter be limited to that portion of the applicable contract price which Buyer is permitted to include for such purposes. . . .

The first issue that needs to be addressed is whether the findings by the APSC in Orders No. 41 and 52 have any bearing on this case, and if so, whether those orders decide the issue of breach as a matter of law. In the proceedings before the APSC in connection with AWG's application for approval of a general change in rates and

tariffs, SEECO took the following position on Contract 59, according to APSC Order No. 41:

> Seeco witness Wilson prepared and introduced studies which calculate the monetary value of Contract 59 unasserted take-or-pay claims and pricing deficiencies that could have or could be asserted by Seeco against AWG. . . . The studies show that the total of Seeco's unasserted take-or-pay claims, pricing deficiencies, and estimated buy-down value of Contract 59 is significantly in excess of $213 million. As explained in the testimony of AWG and Seeco witnesses Johnson, Butler and Scharlau, Seeco claims it knows of no Arkansas law requiring a gas purchaser to renegotiate a contract or demand unilateral concessions from a gas seller.

> Seeco and AWG witnesses Butler and Wilson maintain that Seeco has accepted a price far below what it could have collected under Contract 59. They also testified that Seeco refrained from demanding a formal price redetermination and accepted a price freeze even though AWG had no market-out rights.

> Seeco contends that its forbearance has benefitted AWG and its customers. Seeco states that, while it has foregone its rights under Contract 59 in order to compromise with AWG, its forbearance would be eliminated if AWG is unable or unwilling to keep its end of the bargain. Seeco asserts that Southwestern's stockholders would have every reason and right to demand that the board of directors and management attempt to recoup any value lost as a result of Commission action with regard to Contract 59. Seeco contends that, although [APSC] Staff criticizes AWG for not conducting formal studies concerning takes from Contract 59, AWG management was well aware of the volume requirements under the contract and therefore the results of Seeco's studies came as no surprise to AWG's management.

The APSC concluded in Order No. 41 that the price level in Contract 59 violated the least-cost purchasing statute codified at § 23-15-103, because the price did not represent reasonable market pricing. The APSC stated that the current price under Contract 59 represented a major element in SEECO's and SWN's profitability, and that a significant conflict of interest existed between SEECO and AWG, because both subsidiaries of SWN were controlled by the same management. The APSC also found that the price of gas sold under Contract 59 should be determined by the current market, which would protect both the buyer's and the seller's interests. APSC Order No. 52 approved the Stipulation and Agreement that

was entered into between the companies, the APSC, and the Attorney General on October 31, 1994, whereby SEECO gave up any claims it might have under Contract 59 prior to July 1, 1994.

The appellants' core argument that APSC Orders 41 and 52 somehow control the issue of whether SEECO breached its leases with the royalty owners fails for several reasons. First, as the royalty owners aptly state, this is an appeal from a jury verdict and judgment, not an appeal from a regulatory order issued by the APSC. So while Orders No. 41 and 52 may have been relevant evidence at trial, the jury was free to place whatever weight it chose on these orders. *Griffin v. Woodall,* 319 Ark. 383, 892 S.W.2d 451 (1995). Second, the APSC is a regulatory agency established by the General Assembly to regulate public utilities. Its Orders No. 41 and 52 were concerned with the price that AWG was paying for gas and the effect of that price on its charge to ratepayers. The interests of the royalty owners under Contract 59 were never advanced by SEECO, as an intervenor, or AWG before the APSC, and there was no reason that the APSC should have addressed their interests. In addition, the APSC had no jurisdiction over SEECO, because SEECO is not a public utility subject to regulation under Arkansas law. *See* Ark. Code Ann. § 23-1-101, § 23-2-301 (1987). Charles Scharlau admitted in his testimony that the APSC had no direct authority to interfere with the Contract 59 price between SEECO and AWG. Had AWG and SEECO not been affiliated, SEECO would have not been before the APSC at all. Further, if AWG and SEECO had not been affiliated, SEECO would have had no interest or concern for AWG's ratepayers. SEECO simply would have conducted its business in an effort to receive the price agreed upon in Contract 59.

Third, the position that the appellants take in this appeal is diametrically opposed to the argument SEECO made to the APSC in 1992. At that time, SEECO claimed that it had consistently accepted a price far below what it could have claimed under Contract 59. Now it contends that because the APSC found the price under Contract 59 to be unreasonably high, that finding proves that SEECO did not breach the express royalty clauses in its leases with the royalty owners. As a final matter, Order No. 52 was issued on January 5, 1995, and was to be applied prospectively. Thus, it only altered AWG's ability to pass through Contract 59 prices after that date and had no significance on the right of the royalty owners to

enforce SEECO's lease obligations for the fifteen-year period occurring prior to 1994.

■ We conclude that APSC Orders No. 41 and 52 do not provide a defense to the royalty owners' claims for breach of leases as a matter of law. At the most, the orders presented evidence for the jury to resolve, and the jury resolved the issue of breach of the leases against the appellants.

■ On the appellants' collateral point that the jury was erroneously instructed under Instruction 17 that the gas price under Contract 59 was a guaranteed price for the twenty-year period, we simply disagree that that is what Instruction 17 says. At issue here is what the market price means in a gas contract. This court said in *Hillard v. Stephens*, 276 Ark. 545, 637 S.W.2d 581 (1982), in discussing the meaning of "prevailing market price at the well," that "when a producer's lease calls for a royalty on gas based on the market price at the well and the producer enters into an arm's-length, good faith gas purchase contract with the best price and terms available to the producer at the time, that price is the 'market price' and will discharge the producer's gas royalty obligation." *Id.* at 551, 637 S.W.2d at 584. Thus, under *Hillard*, the contract price agreed to at the time the leases were entered into is the prevailing-market price.

■ The appellants argue that *Hillard* is inapplicable because it does not address how the contract price should be determined. They also argue, as noted above, that *Hillard* was used in this case to support Instruction 17, and that that instruction is misleading because it implies that the market price in Contract 59 could not be changed. Instruction 17 stated that the market value price is the contract price throughout the term of the contract. But that does not mean that the contract price was necessarily unchanging. Indeed, as quoted above and presented to the jury, Contract 59 included a procedure for redetermining the market price on a yearly basis. Additionally, both sides introduced evidence that the price under Contract 59 would change depending on the market. Instruction 17 appears entirely consistent with *Hillard*, and the evidence presented by the royalty owners was sufficient for the jury to find that SEECO accepted less than the market price over the term of Contract 59. The trial judge did not err in giving Instruction 17.

*c. Implied Duty to Market Gas.*

The appellants also claim that with respect to the gas leases SEECO had no implied duty to the royalty owners not to compromise or amend Contract 59. They support their position by citing this court to *Amoco Prod. Co. v. Ware*, 269 Ark. 313, 602 S.W.2d 620 (1980). They argue that it is true under *Amoco* that a producer must exercise reasonable diligence to market gas once it has been discovered on the leasehold and to secure the best possible contract price under prevailing market conditions. But, according to the appellants, this duty did not require SEECO to take action that would require the APSC to step in and regulate the price of gas charged to AWG and passed on to its ratepayers. Contract 59, they emphasize, contained such a regulatory-out clause that had the practical effect of subjecting SEECO to indirect APSC regulation of its prices. Because this sword of Damocles was hanging over SEECO, it made no sense under SEECO's theory to enforce the market price set in Contract 59, when that price was higher than the 1984 freeze price which the APSC found violated the least-cost purchasing statute. In short, they argue that this court should be bound by the APSC's determination on the implied-duty point as well. Again, we disagree.

At trial, the royalty owners called John McArthur as their expert witness who testified about the implied covenant to market. He testified that this implied covenant is an obligation on the part of the gas producer to get the best price possible for production. He explained further that if a lessee pays the royalty owner based on the proceeds he receives, that does not automatically satisfy the lessee's duty to market, because if all the lessee had to do was pay whatever it received, it could enter into a contract for a good price but arbitrarily accept less. While the lessee would still pay the proceeds to the royalty owners, he testified that the lessee would not have satisfied its duty to get the best price.

McArthur also testified that as long as the contract was reasonable when entered into, the lessee could pay the contract price to the royalty owners and satisfy its duty to market. As long as the lessee made a reasonable decision at the outset, it would not be blamed for failing to forecast accurately where the market for gas would go. If the market failed after the contract was entered into, the lessee still would have to pay based on the contract, because the

contract locked in whatever the price terms were subject to the right to redetermine pricing. Hence, according to McArthur, the lessee had an obligation to collect the contract price as part of its duty to get the best price possible for the royalty owners.

McArthur went on to testify that in his opinion, based on the APSC record and other documents in this case, AWG did not satisfy its contract obligations to SEECO under Contract 59. He noted that except for the first two-and-a-half months of the contract, AWG never paid the contract price. Instead, AWG paid a price that was lower than the contract price during the time the gas was regulated, and it paid below the contract price when the gas was deregulated. He added that he saw nothing in the record where SEECO complained to AWG that it was not paying the correct contract price. McArthur testified that in his opinion, SEECO had an obligation to the royalty owners to enforce the terms of Contract 59. He stated that when SEECO entered into the contract, it got a very favorable price and good take-or-pay terms. It then had an obligation to enforce those terms so that the royalty owners would get the benefit of the agreement to which their gas had been committed for twenty years. A second expert witness for the royalty owners, Don Ray George, confirmed McArthur's opinions and calculated the damages from SEECO's failure to enforce Contract 59.

This court has held that the weight and value to be given expert witnesses lies within the exclusive province of the jury, and it is the jury's decision whether to believe or disbelieve any witness. *Dixon Ticonderoga Co. v. Winburn Tile Mfg. Co*, 324 Ark. 266, 920 S.W.2d 829 (1996). Clearly, the jury in this case accorded John McArthur's and Don Ray George's testimony more weight than the appellants' witnesses, and this court will not disturb that finding on appeal. The appellants argue that McArthur's testimony was merely conclusory, but we fail to see how that was the case. Once an expert witness is qualified, the weakness in the factual underpinning of the expert's opinion may be developed on cross-examination, and such weakness goes to the weight and credibility of the expert's testimony. *Jackson v. Buchman*, 338 Ark. 467, 996 S.W.2d 30 (1999). Here, McArthur's testimony was based on the particular facts of the case. While he did reach certain conclusions, these conclusions were thoroughly explained with regard to the law and the facts surrounding this case.

The appellants also contend that the implied duty to market gas does not forbid them from amending Contract 59 as needed. Charles Scharlau, testified that he believed the parties did amend Contract 59 to reflect the lower price agreed to by SEECO, and that the 1984 price-freeze letter he sent on behalf of AWG to SEECO was intended to be an amendment to the contract. That letter from Scharlau stated:

> It is my intention to freeze the price paid for your gas presently being purchased at the Section 102 price at the December, 1984 price for one year, this price will then be reviewed in December, 1985. We are proceeding in this manner due to today's reduced gas markets and the reduction in the price of competitive fuels, in an effort to benefit our consumers.

McArthur addressed whether this constituted a redetermination of the gas price or whether the parties had amended the contract under Contact 59. He concluded that in his opinion, Contract 59 did not allow AWG to reduce the contract price by simply sending a letter to that effect. He went on to say that "there is no economic-out clause in this contract, and that means that what is there are the price promises and the take or pay promises, and those are mandatory promises."

We agree with this opinion. There is no language in Contract 59 which provides for an amendment of the Contract 59 price merely by a letter from AWG. While Contract 59 did allow for a price redetermination under paragraph 6(C), the contract states that the Buyer shall propose a price that will then be redetermined *by both parties*. In the 1984 price-freeze letter, AWG did not propose a new price, but simply stated what the new price would be. SEECO apparently did not play any role in redetermining the price, which means that the price-freeze letter cannot be considered a redetermination under 6(C) of Contract 59. As McArthur pointed out, the risk of market decline is one that AWG assumed in 1978, and it never shifted back to SEECO.

With respect to the regulatory-out clause contained in Contract 59, the clause effectively provided that the Contract 59 price could be reduced automatically to the price that the APSC would allow AWG to pass through to its ratepayers on pain of termination of the contract. It is clear to us that the purpose of this clause is to protect the ratepayers of a regulated entity such as AWG and would

not be included in a contract to protect the royalty owners or producers like SEECO. In his testimony at trial, Charles Scharlau stated that he put the regulatory-out provision in Contract 59 to deal with the contingency where the APSC might rule that AWG could not pass the contract price through to its ratepayers. He stated further that a good number of utility companies use these clauses to protect themselves, if gas prices get out of control and they cannot pass the prices through to their customers.

The main flaw in appellants' argument is that it is purely speculative. The regulatory-out clause in Contract 59 was never invoked by AWG due to any action taken by the APSC. McArthur testified that a regulatory-out clause protects a buyer like AWG from having to buy gas at an unreasonably high contract price. However, he stated that the APSC would have to actually intervene and prohibit the buyer from paying the full contract price. McArthur then testified that the buyer has to try to get the contract price changed, and if that is disallowed, then it can reduce the price.

McArthur then explained that even if the APSC had prohibited AWG from passing through the cost of gas to the ratepayers, that does not mean that AWG was required to pay SEECO less than the contract price. Under Contract 59, according to McArthur, if the APSC had disallowed some pass-through of costs, AWG might propose by written notice to SEECO that the price to be paid should thereafter be limited to that portion of the applicable contract price which AWG was permitted to include for such purposes. But there was nothing to prohibit AWG from paying the full contract price, even though it could only pass through to its ratepayers whatever portion of the price the APSC had allowed.

Though Scharlau's testimony on behalf of AWG stated the case that SEECO's enforcement of Contract 59 would have been to no avail because the APSC would have disallowed it, we are unwilling as a matter of law to adopt that position. We agree with the royalty owners' experts that SEECO's duty was to obtain the best price for itself and the lessors. We can only speculate as to what action the APSC might have taken had SEECO enforced its contract. There is simply no evidence that had SEECO elected to enforce the contract, the APSC would have prohibited pass-through of the prices to AWG's ratepayers and, thus, allowed AWG to terminate the contract. And, of course, the affiliated relationship

between SEECO and AWG raises additional questions about SEECO's lack of enforcement. Charles Scharlau admitted at trial that the reason SEECO did not demand full performance from AWG under Contract 59 was due to the affiliate relationship between the two corporations. All of this was presented to the jury, and it obviously credited McArthur's testimony over Scharlau's. The jury awarded damages based on SEECO's failure to enforce Contract 59. SEECO's own expert, John Wilson, testified before the APSC in 1993 that SEECO's unasserted claims under Contract 59 totaled $295 million. There is no basis for reversal on this point.

### d. Prudent Operator Standard.

Next, the appellants argue that SEECO's conduct in administering Contract 59 was prudent as a matter of law under the prudent operator standard. Much of their argument raises points already addressed. They contend that the expert testimony of John McArthur on this point was insufficient to establish a breach of the applicable standard of conduct, because his testimony failed to lay an adequate foundation with regard to what a prudent operator in SEECO's circumstances would have done. They further contend that the proper comparison should have been to a prudent operator which was a party to a regulatory-approved, long-term contract with a regulatory-out clause, like Contract 59, which sold substantial volumes of gas to an affiliate, and which operated in the same or similar market and regulatory environment as SEECO. They maintain that McArthur simply substituted his own business judgment for SEECO's, and only argued that SEECO should have demanded the prices and "takes" from AWG that allegedly were "guaranteed" by Contract 59.

To summarize, they contend that SEECO's conduct was prudent in light of the APSC's regulatory authority and that this court should give due deference to the findings and orders of the APSC and to SEECO's business decisions. They maintain that the affiliate relationship between SEECO and AWG makes no difference in this case, because the APSC found that the affiliate relationship inured to the benefit of SWN and its shareholders, not to AWG's ratepayers. Moreover, they state that the evidence was compelling that SEECO maintained a Contract 59 price well above other indicators of market value.

█ This point is substantially intertwined with the preceding point in that the prudent operator standard is the test for determining whether a lessee has breached any of the implied covenants, including the implied duty to market. In *Amoco Prod. Co. v. Ware,* *supra,* while this court did not specifically name the prudent operator standard as such, we said:

> Amoco certainly had a duty to act for the mutual advantage of both Amoco and Ware. However, in determining if Amoco did perform in a reasonable and prudent manner, due deference should be given to the judgment of Amoco, as an Operator, regarding how development should proceed. Amoco had to use sound judgment and not act arbitrarily.

*Id.* at 319, 602 S.W.2d at 623.

█ In *Robbins v. Chevron U.S.A., Inc.,* 785 P.2d 1010 (Kan. 1990), the Supreme Court of Kansas stated that the prudent operator standard is what an experienced operator of ordinary prudence would do under the same or similar circumstances, having due regard for the interests of both the lessor and the lessee. The court discussed the standard further:

> It is not the place of courts, or lessors, to examine in hindsight the business decisions of a gas producer. One learned treatise on the subject, 5 Williams & Meyers, Oil and Gas Law § 856.3 (1989), states:
>
> "The greatest possible leeway should be indulged the lessee in his decision about marketing gas, *assuming no conflict of interest between lessor and lessee. Ordinarily, the interests of the lessor will coincide; the lessee will have everything to gain and nothing to lose by selling the product."*

*Id.* at 1015 (emphasis added).

█ In our judgment, the jury in this case was required to judge the actions of SEECO at the time the contract was entered into in 1978 and to judge whether another operator in the same or similar circumstances at that time would have enforced the terms of Contract 59 against AWG. Again, this is an appeal from a jury verdict. Moreover, it is questionable under the *Robbins* decision whether this court should give any deference to the business judgment of SEECO. In *Robbins,* the Kansas Supreme Court stated that great leeway should be afforded a lessee in its decisions about

marketing gas, *assuming no conflict of interest between the lessor and lessee.* There was a conflict of interest in this case because of SEECO's affiliation with AWG. Had there been no affiliation, the jury was free to conclude that SEECO would have attempted to get the best price possible, thus benefitting the royalty owners.

John McArthur's testimony is important on this point as well. He stated that in his opinion, SEECO did not act as a reasonably prudent operator in protecting the interest of the royalty owners. He testified that almost from the beginning, AWG paid less than the contract price. It ignored the redetermination formula and then froze the price. He added that from 1979 through 1994, except for two years, by John Wilson's calculations AWG did not take-or-pay for enough gas. There is no indication anywhere, he said, that SEECO tried to make a claim on the contracts or enforce its contract rights or get the prices that it had been promised by AWG.

■ McArthur, contrary to the appellants' assertion that his testimony was conclusory, supports his conclusions with specific references to documentary proof and relevant events. This proof constitutes substantial evidence to support the verdict, and the trial court did not err in denying appellants' motion for directed verdict and their motion for judgment notwithstanding the verdict.

## II. Directed Verdict and JNOV Regarding Tort Claims

■ The appellants next assert that the royalty owners failed to prove three elements of fraud and constructive fraud: (1) that the royalty owners relied on representations made to them by SEECO; (2) that SEECO had a duty of disclosure; and (3) that the royalty owners exercised due diligence to discover the terms of Contract 59. As an initial matter, the appellants contend that all of the royalty owners' tort claims are dependant upon a contractually-based duty owed by SEECO under its leases. Thus, under the appellants' reasoning, if the royalty owners had no duty owed to them that was breached under their leases, then there can be no basis for fraud claims as a matter of law. We disagree with this rationale. The royalty owners asserted different causes of action in contract and in tort and offered proof to support each cause of action. Additionally, the appellants cite no caselaw in support of their novel theory, and under such circumstances, we will not

address the issue. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999).

The jury returned verdicts in favor of the royalty owners on the claims of fraud and deceit, constructive fraud, and fraudulent concealment. With respect to fraud and deceit, the royalty owners relied on a letter mailed by SEECO in 1983 to affected royalty owners, advising that SEECO had arranged for the sale of their gas to Natural Gas Pipeline of America (NGP). That letter, however, did not inform the royalty owners that the gas being sold to NGP was the same gas SEECO previously dedicated to AWG under Contract 59. In 1987, SEECO mailed a second letter to certain royalty owners offering to buy their mineral interests. This letter stated that gas prices had declined, but it, too, did not inform the royalty owners that Contract 59 protected them against market declines through July of 1998. In this regard, the royalty owners point out that SEECO represented that $0.80 per Mcf was a fair price, when the price under Contract 59 would have been as much as $7.645 and the price under AWG's 1984 price freeze was $3.85 per Mcf. At trial, the royalty owners also offered proof that the monthly statements sent to them by SEECO did not disclose the Contract 59 prices and showed that the lower priced gas was designated as gas produced from oil wells, while the higher priced gas was designated as gas produced from gas wells. The truth, however, was that none of the gas produced from leased wells was gas from oil wells.

### a. Reliance.

To establish fraud, a party must show as an element justifiable reliance on the false representation. *Scollard v. Scollard*, 329 Ark. 83, 947 S.W.2d 345 (1997); *Wheeler Motor Co. v. Roth*, 315 Ark. 318, 867 S.W.2d 446 (1993). This court has defined actual reliance to mean that the plaintiff acted or did not act by reason of the defendant's misrepresentation. *MFA Mut. Ins. Co. v. Keller*, 274 Ark. 281, 623 S.W.2d 841 (1981). In the instant case, the 1983 and 1987 letters were mailed to a large number of the royalty owners. Those letters represented to appellees that they would receive a fair price for their royalty interest, and that SEECO was simply looking out for the best interests of the royalty owners. It is reasonable to conclude that, based on those letters, the royalty owners would

believe that SEECO was working in their interest, particularly since that is what they were told. Class representatives Allen Hales and David Taylor testified that they had no reason to question any of the statements contained in the 1983 or 1987 letters. There was a failure to disclose the contract prices in these letters, but also the royalty check stubs and the monthly royalty statements were misleading. All of this was relied on by the royalty owners to their detriment. We conclude that this amounts to substantial evidence of reliance.

### b. Duty to Disclose.

The appellants challenge the constructive fraud and fraudulent concealment verdicts by arguing that there was no confidential or special relationship between SEECO and the royalty owners to give rise to a duty to disclose. This issue was submitted to the jury under Instruction 19 relating to constructive fraud and under Instruction 21 relating to fraudulent concealment. The appellants did not object to the existence of a confidential relationship in connection with either instruction, according to the abstract.

We have held that whether a confidential relationship exists is a question of fact for the trier of fact to decide. *Donaldson v. Johnson*, 235 Ark. 348, 359 S.W.2d 810 (1962); *see also Marsh v. Nat'l Bank of Commerce*, 37 Ark. App. 41, 822 S.W.2d 404 (1992). Because the jury returned verdicts for fraud, constructive fraud, and fraudulent concealment, we presume that it found that a confidential or special relationship did exist giving rise to a duty on the part of SEECO to speak and clarify misinformation upon which others might rely. *Berkeley Pump Co. v. Reed-Joseph Land Co.*, 279 Ark. 384, 653 S.W.2d 128 (1983). Other jurisdictions have affirmed that a producer occupies a fiduciary relationship with respect to its royalty owners. *See, e.g., Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp.2d 1252 (W.D. Okla. 1997). Charles Scharlau testified that he agreed in 1991 that SEECO owed a fiduciary duty to its royalty owners and added that SEECO had always tried to act as a fiduciary towards them. That supports the jury's verdict. We affirm on this issue.

### c. Due Diligence.

The remaining issue involves whether there was a duty on the part of the royalty owners to be more diligent in discovering the facts surrounding Contract 59. As a preliminary matter, we question whether royalty owners should be required to scour the records of the APSC to meet the standard of due diligence. On this point, there was proof presented to the jury that SEECO and AWG successfully sealed the pertinent documents on file with APSC concerning SEECO's failure to enforce Contract 59. Added to that is the fact that SEECO destroyed its royalty owner correspondence, after discovery began in this matter.

According to Instruction 21, the royalty owners were required to show that they could not have learned about the omitted facts relating to Contract 59 by reasonable inquiry or diligent observation. In their motion for directed verdict, the appellants argued that the royalty owners failed to meet this burden. The jury returned a special verdict finding fraudulent concealment. Hence, the jury disagreed with the appellants and found that the royalty owners did exercise due diligence. We discern no basis for reversing the jury's determination.

### d. Civil Conspiracy.

Nor do we believe that the civil conspiracy verdict fails under the intracorporate conspiracy doctrine, as the appellants contend. That doctrine has been applied primarily in the area of antitrust litigation and provides that a parent company and its wholly-owned subsidiaries cannot conspire with each other for purposes of § 1 of the Sherman Act. See, e.g., Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). The appellants' contention that they acted independently of each other in Contract 59 concessions and in the price freeze seems at odds with their argument of an interdependent corporate family. It seems logical to us that if the corporate subsidiaries were separate enough to contract with each other, as the appellants maintain, they were sufficiently separate to engage in a civil conspiracy.

There is no merit to this point. Other appellate courts have declined to extend the intracorporate conspiracy doctrine to

other areas. *See, e.g., Stathos v. Bowden,* 728 F.2d 15 (1st Cir. 1989) (refusal to apply it to a civil rights action); *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271 (7th Cir. 1989) (refusal to apply it to RICO actions). We likewise decline to apply it to this case.

### e. Tortious Interference.

██ The appellants also urge that the tortious interference verdict regarding interference by SWN and AWG with SEECO's leases with the royalty owners should be reversed because a parent cannot tortiously interfere with a wholly-owned subsidiary and there was insufficient evidence to prove the tort in any event. This argument is not preserved because the appellants' counsel failed to present that particular theory to the trial judge. *Ouachita Wilderness Inst. v. Mergen,* 329 Ark. 405, 947 S.W.2d 780 (1997). We, therefore, decline to address it.

### III. The Trial Judge's Recusal

The appellants argue that Judge Langston improperly refused to recuse in this case even though he had an interest in royalty income under Contract 269 under a gas lease held by SEECO. They observe that Judge Langston based his decision not to recuse on the fact that the royalty owners only sought retrospective royalty payments and that the filing of the first amended complaint, omitting claims under Contract 269, rendered the recusal issue moot. They argue, however, that Judge Langston had a present financial interest in the outcome of the Contract 269 claim, and any damage award would have been paid to his father's estate, and not to his stepmother, who retained a life interest in the royalty interest payments. They argue that if Judge Langston's stepmother died before payment of the judgment, his remainder interest would become a present interest.

Moreover, because a class action cannot be dismissed or compromised without the approval of the trial court, the appellants argue that permission of the judge must be acquired before class claims can be dismissed, even prior to class certification. Under the appellants' theory, if court permission was required to file the first amended complaint, Judge Langston had no authority to make this ruling because he was already disqualified due to his financial inter-

est in the matter. Alternatively, the appellants argue that Judge Langston's disqualification was not cured by the filing of the first amended complaint, because he had potential claims under Contract 269 for the same or similar conduct by SEECO in administering Contract 59, and his rulings and the outcome of the instant case would have precedential value in any separate class action involving Contract 269.

It appears to us that the appellants make the argument for the first time on appeal that any interest under Contract 269 would go to the estate of Judge Langston's father rather than to his stepmother. It further appears that the argument relating to the precedential impact of Contract 59 litigation upon Contract 269 litigation was not made to the trial judge. Neither argument is preserved for our review. *Ouachita Wilderness Inst. v. Mergen, supra.*

We conclude that the appellants are wrong in their argument that the trial judge was disqualified from approving an amendment to the class-action complaint. Rule 23(e) does not require court approval for amendments to complaints but only for dismissals or compromises. Ark. R. Civ. P. 23(e). Neither occurred in this case. There simply was an amendment to the complaint prior to class certification.

Nor do we believe that Judge Langston had more than a *de minimis* economic interest in this matter causing his impartiality to reasonably be questioned. *See Arkansas Code of Judicial Conduct,* Canon 3E1(c). He disclaimed the gas interest affected by Contract 269 seven years before this litigation, and the royalty owners then removed Contract 269 from their complaint as a basis for relief.

It is true that judges must refrain from presiding over cases in which they might be interested and must avoid all appearance of bias. *Arkansas Dep't of Human Servs. v. R.P.,* 333 Ark. 516, 970 S.W.2d 225 (1998). But there is a presumption of impartiality, and the party seeking disqualification has the burden of proving otherwise. *Sturgis v. Skokos,* 335 Ark. 41, 977 S.W.2d 217 (1998). The decision to recuse is within the judge's discretion and will not be reversed absent an abuse of that discretion. *Id.* An abuse of discretion can be proved by a showing of bias or prejudice on the part of the trial court. *Id.* A personal proprietary or pecuniary interest or one affecting the individual rights of the judge is an

interest which will disqualify a judge; however, to be disqualifying, the prospective liability, gain, or relief to the judge must turn on the outcome of the suit. *Id.* The question of bias is usually confined to the conscience of the judge. *Black v. Van Steenwyk*, 333 Ark. 629, 970 S.W.2d 280 (1998). There was no proof presented that Judge Langston stood to gain or lose anything by this litigation. The trial judge committed no abuse of discretion in failing to recuse.

## IV. Venue

With respect to venue, the appellants urge that the real character of this litigation was a cause of action for breach of leases and not tort. *See Bristol-Myers Squibb Co. v. Saline County Cir. Ct.*, 329 Ark. 357, 947 S.W.2d 12 (1997) *(per curiam)*; *Atkins Pickle v. Burrough-Uerling-Braswell*, 275 Ark. 135, 628 S.W.2d 9 (1982). Thus, they maintain that under Ark. Code Ann. § 16-60-104 (1987), venue was only proper in Washington County where the three domestic corporations (SEECO, AWG, and SWN) had their principal offices. The trial judge, however, denied the appellants' motion to dismiss for improper venue on the basis that the royalty owners brought a *bona fide* cause of action in fraud, and proper venue for a fraud action is in any county where a plaintiff resides. *See* Ark. Code Ann. § 16-60-113(b) (1987). Here, class representatives Allen and Mary Nelle Hayes resided in Sebastian County.

■■ We find no error in the trial judge's determination of venue. In *SEECO I*, this court determined that class certification was proper and stated that the issue of a fraudulent scheme was central to the case and a common starting point for all class members. Looking at the royalty owners' complaint, there are numerous paragraphs devoted to allegations of fraudulent conduct on the part of appellants. Furthermore, when making his motion for directed verdict, counsel for the appellants began with the causes of action brought in tort and not breach of the leases. No reversible error is shown on this point.

## V. Second Closing Rebuttal

The appellants next claim that the trial judge committed reversible error by allowing counsel for the royalty owners to make a second closing argument to rebut prejudicial arguments made by

counsel for the appellants. The events which form the setting for this unprecedented issue are these. In his closing argument at the end of the trial, counsel for the royalty owners, Oliver Howard, said:

> What we are dealing with here is not the moral character of people. No individual has been sued in this case. The defendants in this case are AWG and SEECO and SWN. What we have tried to present to you is not moral character but the ways that people have acted, what they have done or not done, that was right or wrong as it related to the royalty owners. Reputation doesn't make any difference.

In his closing argument counsel for appellants, Tom Mars, countered:

> [L]awyers would call this a kill-the-company case. What Mr. Howard has asked you to do not only threatens the very existence of a company that's been in business in northwest Arkansas since 1929, what he asks you to do threatens the previously untarnished reputation of Charles Scharlau and everybody who worked with him on the senior management team, to get the best price that they could get under Contract 59.
>
> ....
>
> The evidence in this case shows that Charles Scharlau has been in this business for forty years and that he has earned a stellar reputation both in the Arkansas business community and in the gas industry across the nation.... And not once, not once, until this case was filed has anybody ever accused him of cheating people, treating people unfairly, breaching his obligations to people, or committing conspiracy to commit fraud.
>
> Now, Mr. Howard began his closing argument by trying to down-play the significance of the fact that this case involves Charles Scharlau by telling you this case is about companies. But, remember what he told you in opening statement, he showed you this chart, right here, and he put Charles Scharlau right in the center of the chart, and since the first day of this trial, the plaintiffs have set their sights on Charles Scharlau as the ringleader of this vast conspiracy.
>
> ....

More than anybody else, Mr. Scharlau deserves your verdict. He deserves to leave this courtroom with the reputation that he walked in here with. He deserves to get this case over with and to retire with the same reputation, the same honor, and the same respect that he worked 40 years to achieve.

[H]e wants to see it through to the very end. He's going to. And your verdict in this case should, it must, clear the defendants and Mr. Scharlau and the senior management team of this company of any wrongdoing whatsoever. What I mean to say, Members of the Jury, is that there *is* no room for compromise here. For you to find that the plaintiffs are entitled to one dollar, to say nothing of $62 million, would first require you by their theory of the case to find that Mr. Charles Scharlau, who has previously never been accused of being unfair to anybody, is guilty of conspiracy, fraud, breaching obligations to royalty owners and all other kinds of wrongdoing, that Mr. Howard has outlined in his closing remarks.

. . . .

The plaintiffs have made this case all about Charles Scharlau. He didn't deserve to go through this and neither did the other company people. He didn't deserve to be accused of cheating these royalty owners. He didn't deserve to be accused of conspiracy and fraud.

No objection was made by counsel for the royalty owners during this argument. The following morning, counsel for the royalty owners objected to the appellants' closing argument and presented a third-party complaint filed in federal district court in 1995 in the case of *SWN, et al. v. Vesta Energy Co.,* Case No. 94-5006 (W.D. Ark.). In that case the third-party complaint had been filed against Charles Scharlau for fraud, misrepresentation, fraudulent inducement, breach of fiduciary duty, wrongful interference with prospective business, and conspiracy. Tom Mars was counsel for Scharlau in the *Vesta Energy* litigation. Counsel for the royalty owners argued to the trial judge that he did not object at the time of the Mars closing argument, because he was not certain that Mars's statements were wrong, though his co-counsel had written him a note that she suspected Mars was misrepresenting the facts. After confirming the facts overnight, Howard stated that he immediately brought the matter to the attention of the court. Howard asked for a mistrial, but in the alternative asked for additional time

to rebut the Mars closing argument. The court decided that Howard could present the matter to the jury, but refused to let the appellants present evidence that the case had settled for $6 million in what they contended was Scharlau's favor.

Howard then began a rebuttal closing argument. Co-counsel for the appellants, John Everett, made an initial objection which was overruled, and after Howard began to describe the *Vesta Energy* complaint, this colloquy ensued:

> MR. EVERETT: Your Honor, what Mr. Howard just told the jury is not right about the defendants of that case. If he's going to read it, he needs to read it right.
>
> THE COURT: Mr. Everett, I do not want to hear any comments from the defense on this particular matter in front of the jury.
>
> MR. EVERETT: Your Honor, I cannot object at all no matter what he says, is that what I'm --
>
> THE COURT: That's correct.
>
> MR. EVERETT: To understand?
>
> THE COURT: That's correct.

Howard then concluded:

> Ladies and gentlemen, this federal complaint was sent under a sworn certificate of service to the attorney who represented Charles Scharlau. His name is Tom Mars. Representing the companies in that case in which all those allegations were made against Mr. Scharlau was Mr. Jeffrey Dangeau, as well as the firm of Everett and Mars.
>
> Mr. Dangeau, Mr. Everett, Mr. Scharlau were here, present, when Mr. Mars was telling you falsehood after falsehood yesterday and not a one of them got up to correct it.
>
> It's time for this to stop.
>
> My grandmother, who I loved dearly -- I used to call her Mi-Ma. When I used to go to church ... I started preaching when I was 15 years old and she let me drive her old Buick. We'd go to church together on Sunday morning.
>
> MR. EVERETT: Your Honor, surely this is not rebuttal.

THE COURT: Be overruled.

*Continuing By Mr. Howard:*

She used to tell me a lot of things about her philosophy of life as we traveled down those county roads to Lamar and Pleasant Ridge and Atwood. And there were a couple of things that I always remembered that Mi-Ma taught me. She taught me that cheaters never win. There's been times in my life where I don't think I believed that, but as I am now 53 years old, cheaters don't win. The other thing that she taught me, ladies and gentlemen ... She was a country girl from Arkansas. Grew up around Morrilton. She used to say — she called me "Little Oliver" because my granddad was named Oliver — "Little Oliver, you need to always remember, son, that what you do in life someday will come home to roost." And I knew what her meaning was. It always catches up with you, doesn't it? Well, folks, twenty years of cheating and lying and hiding and twisting the truth have just come home to roost.

I hope that the false statements made to you by Mr. Mars yesterday will not interfere with your ability to look at this intelligently and soberly and earnestly.

You got more than you paid for, but you're here and you're here to do a job.

I'll leave you with one last thought. I don't know how all of this makes you feel, but it gets me in my gut. I worked three long, hard years to go to law school with a wife and three kids and a full-time preaching job because I wanted to make a difference, because I believed in our system of justice. There were tears in my eyes the day I took that oath to be an officer of the court, licensed to practice law before the Supreme Court of the State of Oklahoma. I had a firm belief that, as a lawyer, I could do good for people. And I've represented all kinds of people, great big corporations and little bitty people, and there isn't anybody that fights harder than I do because I am obligated to zealously stand up for and to prosecute the rights of my clients.

When I accepted the representation to represent these 7,000 people, it was an awesome responsibility. I haven't met most of those people and I have a fiduciary duty to them. I want them to win because it's the right thing to do, but I don't want them to win because I've tricked you into giving us a verdict.

I stand about two inches shorter this morning than I did yesterday. What has happened here hurts deeply to people who practice this profession. It cuts to the quick of what we stand for and believe in.

Ladies and gentlemen, here it is. I ask you to look into your heart, to look into your soul, to make an honest and a good decision, faithfully discharging your obligations as jurors.

Thank you.

MR. EVERETT: Your Honor, I move the Court for an opportunity to respond. I move the court for an opportunity to tell the jury how the underlying case came out.

....

THE COURT: Mr. Everett, please, I've already ruled against you on this.

Again, this court views these developments at close of trial as unprecedented. But our task is to decide whether in attempting to correct the prejudice committed by Mars for the appellants, the trial judge permitted Howard for the royalty owners to go too far, thereby prejudicing the jury against the appellants. With the benefit of hindsight, several things might have been done differently. Howard for the royalty owners could have asked to approach the bench in a sidebar conference and announced his suspicions about the Mars argument during that argument. The trial judge could also have limited Howard to reading the *Vesta Energy* complaint without any additional commentary and argument.

We are mindful, however, of two things. This situation was brought about by the misrepresentation by Mars of Scharlau's prior litigation. And this was a matter that Mars and Scharlau should have been well aware of, since Mars was counsel for Scharlau in the *Vesta Energy* matter. The second point of which we are assured is that a mere admonition to disregard Mars's statement would not have cured the prejudice.

The trial judge, accordingly, was placed on the horns of a dilemma by the Mars argument. We cannot say, under these unique circumstances, that he abused his discretion in (1) allowing Howard to confirm the facts overnight before objecting, and (2) permitting Howard to read the allegations in the *Vesta Energy* com-

plaint and place that litigation into context for the benefit of the jury.

What is troublesome to this court, however, is that Howard did more than that in making an emotional appeal to the jury with the court's blessing, and appellants' counsel was called down for objecting to the argument. Again, was this so prejudicial as to warrant a new trial after two weeks of testimony or, more exactly, did the trial judge abuse his discretion in allowing this sequence of events to transpire?

 We do not condone in any way the trial judge's allowance of this emotional argument. But the issue, again, is whether the trial judge abused his discretion in allowing it. *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999). We have said that when we examine a discretionary decision by a trial judge, the question is not what we would have done, but whether as a matter of law discretion was abused. The question for us as an appellate court is: was the judge's judgment call arbitrary or groundless? *Looper v. Madison Guaranty Savings and Loan Ass'n*, 292 Ark. 225, 729 S.W.2d 156 (1987). Though we do not approve in any form or fashion or endorse the procedure followed in this case to correct the error and prejudice initiated by counsel for the appellants, we cannot say that under these unique facts the judge's decision was arbitrary or groundless.

## VI. Miscellaneous Issues.

### a. Individual proof of Reliance and Due Diligence for Fraud and Fraudulent Concealment Claims.

The appellants refer to *SEECO I* and contend that this court held that there should be individual trials for issues such as reliance and due diligence, and this did not occur. Rather, they claim that these issues were treated as common issues and were decided based solely on the testimony of class representatives Allen Hales and David Taylor. As a result, they maintain that essential elements of the class claims for fraud were presumed against them, contrary to this court's mandate.

In *SEECO I,* this court said:

We hold that although the fact that lack of reliance and diligence may be arguments raised by the appellants, these challenges will not override the common questions relating to the allegation of a scheme perpetrated by the appellants. The overarching issue which must be the starting point in the resolution of this matter relates to the existence of an alleged scheme. There was no abuse of discretion by the trial court.

....

As noted, this court has held repeatedly that real efficiency can be had if common, predominating questions of law or fact are first decided, with cases then splintering for the trial of individual issues, *if necessary*.

330 Ark. at 414–415, 954 S.W.2d at 241 (emphasis added).

 We do not read this language as a mandate to hold separate trials for individual issues. Our opinion clearly states that the trial judge had the option of "splintering the trial of individual issues, *if necessary*." In this case, the judge chose not to have separate trials due to the fact that the monthly royalty statements and royalty check stubs went to all royalty owners, and the 1983 and 1987 letters went to many of the lessors. None of these documents disclosed the Contract 59 gas price, and in the case of the monthly statements, they were misleading about the origin of the gas. There was no abuse of discretion on this point.

### b. Evidence of Concessions by Other Producers.

The appellants claim that evidence showing that AWG received concessions from unaffiliated producers with regard to "market-outs," well releases, price freezes, and reduced take-or-pay obligations from the 1980's through 1992 was relevant and essential to SEECO's defense that it acted prudently in agreeing to the same or similar concessions in the instant case. The appellants maintain that the trial judge abused his discretion by disallowing this evidence as irrelevant. We disagree.

 On August 24, 1998, the royalty owners filed a motion *in limine* asking the trial judge to preclude the appellants from referring to or offering at trial evidence showing that unaffiliated gas producers accepted a price freeze or made other contract con-

cessions that were comparable to or more onerous than those SEECO accepted. The trial judge granted the motion based on Charles Scharlau's deposition testimony that AWG had no contract for gas "comparable" to Contract 59. This court has held that the relevance of evidence is within the trial court's sound discretion, subject to reversal only if an abuse of discretion is demonstrated. *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Potlatch Corp. v. Missouri Pac. R.R. Co.*, 321 Ark. 314, 902 S.W.2d 217 (1995). The appellants cite us to *Parker v. TXO Prod. Corp.*, 716 S.W.2d 644 (Tex. 1986), and emphasize that in *Parker*, the trial court affirmed the prudency of a gas producer's contract with an affiliated buyer based in part on the fact that other unaffiliated sellers were accepting terms similar to those that the affiliated buyer offered. But the *Parker* decision does not address a challenge to the comparability of the evidence of other concessions. Thus, it is not instructive on this point.

 Because Scharlau himself testified in deposition that Contract 59 was not comparable to other AWG contracts, the appellants' contention here is effectively undermined. Scharlau confirmed this by testifying that AWG had to rely on its contract with SEECO for fifty percent of the gas it needed and that the underlying reserves and delivery system for Contract 59 fit the specific purpose of serving AWG's markets and operational requirements. The trial judge did not abuse his discretion in denying the admission of other unaffiliated producer concessions into evidence.

### c. Directed Verdict on Fixed-Rate Leases

The appellants urge that it was essential that the royalty owners establish a conversion of the fixed-rate leases into proceeds leases in order to recover damages for the fixed-rate lessors. This is so, they contend, because even if SEECO had received additional proceeds under Contract 59 from 1979 to 1994, there still would be no corresponding obligation to pay additional royalties to fixed-rate lessors under a fixed-rate lease. They argue that the only testimony concerning modification of the leases came from class representative, David Taylor, who testified that the payment and acceptance of proceeds under his fixed-rate lease was a "mutually consented action based on the course of conduct over a number of years." They contend that the records only show a unilateral decision by

SEECO to pay proceeds received on the fixed-rate leases for its own corporate purposes and not a mutual agreement between SEECO and the fixed-rate lessors to modify the leases. Hence, they conclude that the trial judge committed reversible error when he directed a verdict on this issue in favor of the plaintiff class.

■ We need not address the merits of this issue. Following the presentation of appellants' case, the counsel for the royalty owners moved the judge to direct a verdict in their favor on the issue that the fixed-rate leases had been converted into proceeds leases by course of conduct of the parties. The trial judge granted the motion, and the appellants voiced no objection to either the motion or the ruling. It is axiomatic that the appellants should have objected to this motion at first opportunity. *Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998). The appellants waived this issue at the trial level, and we will not address it for the first time on appeal.

### d. Alter-Ego and Civil Conspiracy Instructions.

The appellants next argue that the royalty owners could not seek recovery on the inconsistent theories of civil conspiracy and alter-ego status. They add that none of the jury verdicts with the exception of civil conspiracy can be sustained without a finding that AWG and SWN were alter-egos of SEECO, or that SWN was the alter-ego of AWG in the case of tortious interference. According to the appellants, occupying the status of an alter-ego to another company is inherently at odds with entering into a conspiracy with that company.

■ The abstract and record reflect no objection to the jury verdict until the appellants filed their JNOV motion. This court has held that the time to object to an irregularity and inconsistency in the verdict is before the jury is discharged. *P.A.M. Transp., Inc. v. Arkansas Blue Cross & Blue Shield*, 315 Ark. 234, 868 S.W.2d 33 (1993). The purpose of this rule is to allow the trial court to resubmit an inconsistent verdict to the jury. *Id.* No timely objection was made. Plus, the record and abstract of the record reflect that the appellants made no objection to either Instruction 7 on alter-ego or Instruction 27 on civil conspiracy. This issue is not preserved for our review.

### e. *Statute of Limitations.*

The appellants next contend that the statute of limitations for breach of the leases and for the various torts was never tolled, because the royalty owners failed to establish when the tolling of the limitations statute would have occurred. They further contend that damages under the implied-covenant-to-market claim accrued monthly from 1979 to 1994, as the under payments occurred. Hence, they conclude that damages are barred for all months prior to May, 1993.

■ There was no error in this regard. There was substantial evidence presented to the jury that the royalty owners claimed that their causes of action did not accrue until October 31, 1994 — the date of the Stipulation and Agreement in which SEECO waived and released AWG from all take-or-pay pricing, buydown, and other contractual claims under Contract 59. The royalty owners filed their complaint on May 24, 1996. We conclude that the statute of limitations began to run on October 31, 1994, and that the complaint was timely.

■ In addition, this court has often stated that a concealed fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence. *Martin v. Arthur*, 339 Ark. 149, 3 S.W.3d 68 (1999). The jury found fraudulent concealment in this case by a special verdict. On this point, we are again mindful that the appellants succeeded in putting John Wilson's report that documented SEECO's deficiencies regarding Contract 59 under seal to avoid providing a "road map" to the royalty owners for future litigation. Additionally, the trial judge gave a spoliation instruction (Instruction 10), after it determined that the appellants had intentionally destroyed the royalty owner correspondence files, after discovery commenced in this matter.

The jury's conclusion that there was no limitations defense was reasonable. There was no reversible error on this point.

*f. Damages for Breach of Take-Or-Pay Rights.*

For their final point, the appellants vigorously contend that take-or-pay or other contract settlements are not royalty-bearing unless specifically tied to gas production. Therefore, damages awarded based on failure to honor take-or-pay obligations constitute reversible error.

The pertinent statute on this point reads:

> It shall be the duty of both the lessee, or his assignee, and any pipeline company, corporation, or individual contracting for the purchase of oil or gas under any oil, gas, or mineral lease to protect the royalty of the lessor's interest by paying to the lessor or his assignees the same price *including premiums, steaming charges, and bonuses of whatsoever name* for royalty oil or gas that is paid the operator or lessee under the lease for the working interest thereunder.

Ark. Code Ann. § 15-74-705 (Repl. 1994) (emphasis added). This court has not addressed this statute in the context of take-or-pay obligations, but in *Klein v. Arkoma Prod. Co.*, 73 F.3d 779 (8th Cir. 1993), and *Klein v. Jones*, 980 F.2d 521 (8th Cir. 1992), the Eighth Circuit Court of Appeals allowed the royalty owners to share in a take-or-pay settlement made between the lessee and the natural gas pipeline that purchased the lessee. In doing so, the Eighth Circuit adopted the Harrell Rule. Under the Harrell Rule, oil and gas leases are construed in a manner so that the lessee and lessor split all economic benefits arising from those leases. The Eighth Circuit then held that the Harrell rule entitled the lessors to share in all proceeds, which meant that the royalty owners were entitled to receive a portion of the take-or-pay settlement.

The appellants argue that only two jurisdictions have held that take-or-pay settlements are royalty-bearing, the other jurisdiction being Louisiana. *See Frey v. Amoco Prod. Co.*, 603 So.2d 166 (La. 1992). The vast majority of jurisdictions, they maintain, have held that take-or-pay settlements are not royalty bearing. While the appellants may be correct that most jurisdictions reject the Harrell Rule, the appellants do not address the fact that Arkansas has a statute, § 15-74-705, that appears to decide this issue. In their reply brief, the appellants counter that the statute refers "to premiums or bonuses" paid to an operator for royalties on gas that

has been *produced or sold.* However, the statute does not specify that the gas has to have been produced or sold. It only states that the premiums or bonuses must be paid when any money is paid the lessee. It follows that if SEECO had received a settlement on the take-or-pay deficiencies, SEECO would have then been obligated to pay "to the lessor or his assignees the same price . . . for royalty oil or gas that is paid the operator or lessee under the working lease thereunder" under the statute. Finally, Charles Scharlau, in his testimony before the APSC, admitted that under *Klein I and II* , royalty owners were entitled to share in buydowns as well as take-or-pay proceeds. He testified differently at trial, however.

There is no merit to the appellants' argument in this regard.

Affirmed.

SPECIAL ASSOCIATE JUSTICE NOYL HOUSTON joins.

CORBIN, J. and SPECIAL ASSOCIATE JUSTICE SAM LASER concur.

THORNTON and SMITH, JJ., not participating.

DONALD L. CORBIN, Justice, concurring. I concur with the majority's decision in this matter, but I write separately to express my concern about the trial court's ruling that permitted Appellees' counsel, Mr. Howard, to deliver a second closing rebuttal. I am deeply concerned that our holding today will serve as an unwelcome precedent, permitting or even encouraging this type of action by parties in the future. Specifically, I am personally appalled at Howard's statements regarding his upbringing and moral philosophy, and I believe his comments went beyond that necessary to cure the prejudice that had resulted from Mr. Mars's erroneous statements about . Charles Scharlau's alleged untarnished reputation.

I am even more appalled that the trial judge allowed this irrelevant argument to continue despite repeated objections by Mr. Everett, co-counsel for the Appellants.[1] I understand the difficult predicament that the trial judge was in, and I agree with the majority that he was correct to allow Howard to inform the jury of

---

[1] I hasten to point out that Mr. Everett never deviated from the maintenance of professional integrity during the course of the trial.

Mars's misstatements. However, in my opinion, he went too far when he allowed Howard to comment further, particularly about Mars's knowledge of the falsity of his own statements and about how "twenty years of cheating and lying and hiding and twisting the truth have just come home to roost."

The reason that this is not a dissent, however, is because this entire mess is of the Appellants' own making. This situation is closely akin to the doctrine of invited error, and I will not reward Appellants for their own counsel's misrepresentations to the jury.

In sum, this trial involved the claims of approximately 7,000 persons and took some two weeks and numerous witnesses to try. There was no reversible error committed during the trial. I cannot in good conscience vote to reverse this case based on my concern about the precedent that might be set for future cases. As the majority correctly points out, the trial court's ruling was ultimately a discretionary call that had to be made "on the horns of a dilemma." Accordingly, in light of the exceptional and unique circumstances of this case, I simply cannot say that the trial court's ruling was either arbitrary or groundless.

SAM LASER, Spl. J., joins.